NEIGHBORHOOD LEGAL SERVICES,
INC.

v.

LEGAL SERVICES CORPORATION.

Civ. No. H–78–627.

United States District Court,
D. Connecticut.

Jan. 16, 1979.

---

John Rose, Jr., Louden, Byrne, Shechtman, Slater & Rose, Hartford, Conn., for plaintiff.

William H. Clendenen, Jr., Clendenen & Lesser, New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION .

NEWMAN, District Judge.

This suit challenges the decision of defendant Legal Services Corporation ("the Corporation") to deny refunding to the plaintiff Neighborhood Legal Services, Inc. ("NLS") for the Farmworker Division of NLS. The Corporation, organized under the laws of the District of Columbia with its principal place of business there, was created by Congress in 1974 to provide funding for civil legal assistance to indigents, Pub.L. No.93–355, as the successor to the legal services component of the Office of Economic Opportunity. NLS is a private non-profit corporation, organized under the laws of the State of Connecticut and with its principal place of business in Hartford, Connecticut, providing legal services to low income persons in the Hartford area. In 1977 the Corporation provided $310,000 of the $550,000 budget of NLS, including $58,250 for the Farmworker Division.

On November 28, 1977, the Regional Director of the Corporation informed NLS of a preliminary decision to deny the application for refunding of the Farmworker Division. The Regional Director noted that prior to 1975 nearly 10,000 migrant workers had come from Puerto Rico to Connecticut annually to pick tobacco, and that with the 1975 decision of the tobacco growers to cease recruiting Puerto Rican migrant farm workers, this influx has been "virtually shut off."[1] NLS sought administrative review of this preliminary denial. See 45 C.F.R. § 1606.7. A hearing examiner was designated, and a hearing was held in April, 1978. On September 1, 1978, the hearing examiner submitted to the President of the Corporation proposed findings of fact, conclusions of law, and a memorandum opinion. The examiner concluded that there were 7,000 migrant workers and dependents in the area served by the NLS Farmworker Division and that the Corporation had a policy of funding migrant worker programs only where the service area included at least 10,000 migrant workers and dependents. However, the examiner concluded that the Corporation had violated 42 U.S.C.A. § 2996g(e) by failing to publish in the Federal Register its policies concerning funding of migrant worker programs. He identified two or three policies that required prior publication. In his memorandum opinion, he referred to the Corporation's decision to use migrant worker funds only for services to migrant workers, and the decision to fund only programs serving more than 10,000 migrant workers. In his conclusions of law (no. 6), he also referred

---

1. While NLS disputes that the administrative record supports either of these two statements of the Regional Director, the parties seem to agree that some decline has occurred in the number of migrant workers coming to Connecticut.

to the need for publication of the Corporation's definition of "migrant." He concluded that the lack of publication of these policies rendered them an "ineffectual" basis for the denial of NLS's request for refunding (no. 5). He recommended that the 1978 application of NLS's Farmworker Division be funded (Examiner's opinion 1).

Pursuant to 45 C.F.R. § 1606.15, the President of the Corporation issued his final determination on October 19, 1978. He concluded that policies affecting the decision-making process of the Corporation's staff concerning allocation of funds are not required to be published. He therefore concluded that the Regional Director's preliminary decision to deny refunding should become the Corporation's final decision. This suit followed.

■ Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1332 and the Administrative Procedure Act. While the A.P.A. does not provide jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), federal question jurisdiction is present, as is diversity jurisdiction.

■ As a threshold matter, NLS contends that the decision of the President of the Corporation is a nullity because rendered beyond the 20-day limit specified in 45 C.F.R. § 1606.15. The President's decision was rendered after the 20-day period provided by regulation, but satisfied the more general statutory requirement of "timely" consideration. 42 U.S.C.A. § 2996j(2). While a decision rendered after the 20-day period specified in the regulation might warrant relief in some circumstances, it does not do so here. The Corporation provided NLS with interim funding not only during the time the matter was pending before the President, but for an additional 30 days after his decision.

■ The basic complaint of NLS is that the Corporation's policies concerning funding of migrant worker programs cannot be used to deny its application for 1978 funding for lack of publication in the Federal Register and an opportunity for public com-

ment prior to their becoming effective. While NLS is thus complaining that the Corporation failed to observe a required rule-making procedure, its lawsuit also raises issues concerning lack of required publication. The requirements are distinct. Rule-making requires publication of a proposed rule in the Federal Register and an opportunity for public participation in the development of the final version of the rule. A publication requirement assures at least public notice, through the medium of the Federal Register, of an agency policy, even though the policy can become effective promptly.

■ The legislation creating the Corporation provides that the Corporation shall not be considered an agency of the Federal Government, 42 U.S.C.A. § 2996d(e)(1), and it is therefore exempt from the general coverage of the Administrative Procedure Act, including the A.P.A.'s rule-making provisions, 5 U.S.C.A. § 553. However, the Corporation's authorizing statute contains its own rule-making and publication requirements, 42 U.S.C.A. § 2996g(e).

Section 2996g(e) provides:

The Corporation shall afford notice and reasonable opportunity for comment to interested parties prior to issuing rules, regulations, and guidelines, and it shall publish in the Federal Register at least 30 days prior to their effective date all its rules, regulations, guidelines, and instructions.

■ The Corporation has apparently lumped the rule-making and publication requirements together and construed § 2996g(e) to require publication of "all generally applicable directives concerning the activities or conduct of recipients" but not "documents intended solely to govern the conduct of [the Corporation's] personnel." (May 15, 1978, Memorandum of Corporation's General Counsel, attached to response to hearing examiner's opinion). This distinction is consistent with judicial construction of the *rule-making* requirements of the A.P.A. See *Noel v. Chapman*, 508 F.2d 1023 (2d Cir. 1975). Some instructions to staff may have the effect of regulating

the conduct of recipients, but with respect to criteria for funding, no rule-making requirement should be read into § 2996g(e) that is more rigorous than the rule-making provisions of the A.P.A., which specifically exempt matters relating to grants. 5 U.S.C.A. § 553(a)(2). See *Opelika Nursing Home, Inc. v. Richardson*, 356 F.Supp. 1338 (D.C.Ala.1973); *Rodriguez v. Swank*, 318 F.Supp. 289 (N.D.Ill.1970), *aff'd*, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). Since Congress has not applied the rule-making provisions of the A.P.A. to the Corporation, the Corporation is entitled to conclude that its own rule-making requirement is not more rigorous than that of the A.P.A.

However, § 2996g(e), like the A.P.A., contains both a rule-making requirement and a publication requirement. Furthermore, the publication requirement of the A.P.A., § 3 of the original 1946 Act, as amended by the Freedom of Information Act (F.O.I.A.), 5 U.S.C.A. § 552, has been specifically applied by Congress to the Corporation. 42 U.S.C.A. § 2996d(g). Apart from rule-making requirements, this case thus presents the issues of whether funding criteria must be published and, if so, what consequences result from a failure to publish such criteria.

As with rule-making, there is no reason to think that the publication requirement imposed upon the Corporation by its own statute is more rigorous than the A.P.A. requirements. Unfortunately, neither the text nor the legislative history of § 2996g(e) sheds much light on its meaning. The House bill, H.R.7824, 93d Cong., 1st Sess., § 8(f) (1973), required publication of the Corporation's bylaws, rules, regulations, and guidelines. There is no indication of the coverage of these terms, although since bylaws were not subject to notice and comment requirements, the House bill does reflect the view that the publication requirement is broader than the rule-making requirement. The Senate Bill, S.2686, 93d Cong., 1st Sess., § 1008(f) (1973), required publication of the Corporation's rules, regulations, guidelines, instructions, and applica-tion forms. Since only rules, regulations, and guidelines were subject to notice and comment requirements, the Senate bill plainly contemplated a publication requirement broader than the rule-making requirement. The Conference Committee deleted "application forms" but left "instructions" within the category of documents required to be published but not subject to notice and comment. Conf.Rep.93–247, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 3872, 3897.

Nor does the legislative history of the Corporation's statute illuminate the provision subjecting the Corporation to the publication requirement of the F.O.I.A. This provision originated in § 8(e) of the House bill. The House Report states that the Corporation was made subject to the F.O.I.A. "so that appropriate documents in the Corporation's custody may be examined by members of the public." H.Rep.93–247, 93d Cong., 1st Sess. 13 (1973), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 3872, 3884. This suggests the F.O.I.A. was incorporated to make applicable the public inspection provisions of § 552(a)(2), rather than the publication requirements of § 552(a)(1). In any event, the Corporation's statute adopts all of the F.O.I.A., including its publication requirement. Therefore its meaning and the consequence of its violation must be explored.[2] Some clues may be gleaned from a comparison of the present version with the original publication requirement contained in § 3 of the A.P.A.

As originally enacted in 1946, the A.P.A. publication requirement was as follows:

### PUBLIC INFORMATION

Sec. 3. Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency— (a) RULES.—Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its

---

2. See *Rodriguez v. Swank, supra*, 318 F.Supp. at 295; *Housing Authority of Omaha v. United States Housing Authority*, 468 F.2d 1, 8 n.13 (8th Cir. 1972).

central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals or requests; (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published.

The F.O.I.A., as enacted in Pub.L.No.89–487 and codified by Pub.L.No.90–23, changed the publication provisions of the A.P.A. to read as follows:

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

. . . . .

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency . . .
Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

While the Senate Report on the bill that became Pub.L.No.89–487 calls the changes in subsection (a) of § 3 "minor," S.Rep.813, 89th Cong., 1st Sess. 6 (1965), U.S.Code Cong. & Admin.News 1966, p. 2418, their import is not entirely clear. Two matters are noteworthy. First, the 1946 version

required publication of "statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public . . ." § 3(a)(3). The current version deletes the phrase "for the guidance of the public" as a modifier of the policy statements that are to be published, and places the phrase in the introductory language as a modifier of the publication requirement. This shift carries a substantive implication. It suggests that the policies required to be published in the original A.P.A. were those that imposed some regulatory authority upon the public, whereas the current version deletes this limitation and recognizes that guidance of the public is achieved by publication of all policies of general applicability, not only those that regulate or supply "guidance" to the public. This view of the shift in placement of the phrase "for the guidance of the public" was contemporaneously expressed in a detailed analysis of the Freedom of Information Act by the Attorney General:

Deletion of the latter phrase at this point is designed to require agencies to disclose general policies which should be known to the public, whether or not they are adopted for public guidance.

Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 10 (1967) (hereafter "Memorandum").

The Corporation's definition of a "migrant worker" and the adoption of a criterion that a legal services agency must serve at least 10,000 migrant workers to be entitled to a grant from funds earmarked for services to migrant workers are both matters of general policy that should be known by the public.

The second change effected by the F.O.I.A. concerns the consequences of not publishing as required. The 1946 version of § 3 of the A.P.A. provided: "No person shall in any manner be required to resort to organizations of procedure not so published." The current version states: "Except to the extent that a person has actual and timely notice of the terms hereof, a person may not in any manner be required to resort to,

or be adversely affected by, a matter required to be published in the Federal Register and not so published." The original version afforded relief for failure to observe unpublished requirements concerning only procedural matters. The current version is arguably much broader, depending upon the meaning of "adversely affected."

A Senate Report issued in 1964 concerning the bill that became the F.O.I.A. noted the change in sanctions for non-publication, stating broadly that "matters required to be published and not so published shall be of no force and effect . . . ." S.Rep.1219, 88th Cong., 2d Sess. 12 (1964). However, the final Senate report omits reference to unpublished materials having "no force and effect" and notes only that no person shall be "adversely affected" by unpublished matters. S.Rep.No.813, 89th Cong., 1st Sess. (1965). The Attorney General's Memorandum attributes much significance to this deletion:

> The Senate Committee . . . decided after issuing its report in the 88th Congress, that the "new sanction should apply only to matters which impose an obligation upon persons affected, and not to matters which benefit such persons . . ."

> From the revised explanation it is evident that the new provision enlarges upon the corresponding provision of the original section 3. It applies not only to organization and procedure, but also to the other items within the publication requirements of subsection (a)—substantive rules, statements of policy, and interpretations. However, the new sanction operates only to relieve persons of obligations imposed in materials not published, and not to deny them benefits.

Memorandum, *supra*, at 11–12.

This is a reasonable construction of the sanction provision of § 3 (present § 552(a)(1)). It would surely not have been a "minor" change if the "adversely affected" phrase meant that any applicant for a benefit must receive it whenever an agency denies the application on the basis of an unpublished criterion. In some circumstances, "adversely affected" may have a limited meaning even in the context of the denial of benefits. If an applicant prepared his application in ignorance of an agency criterion that he could have satisfied, rejection in such circumstances may "adversely affect" him at least to the extent of warranting a remand to permit a new application submitted in light of the discovered criterion. But an unpublished grant-making criterion is not void.

The case principally relied on by NLS, for the proposition that an unpublished grant-making criterion is unenforceable, *Anderson v. Butz*, 550 F.2d 459 (9th Cir. 1977), had no occasion to distinguish between consequences of noncompliance with rule-making requirement of § 553 and the publication requirement of § 552. The agency in that case, the Department of Agriculture, had removed itself from § 553's exemption for grants.[3] See *Anderson v. Butz*, 428 F.Supp. 245, 249 (E.D.Cal.1975). Publication in *Anderson* therefore meant publication prior to effective date of the policy and opportunity for comment. Lack of such publication deprived the public of an opportunity to shape the content of the challenged policy and therefore rendered the policy unenforceable. If the Ninth Circuit also meant that failure to comply with a § 552 publication requirement concerning a grant-making policy renders such a policy void even though the applicant learns of the policy and is not prejudiced by lack of publication, this Court respectfully disagrees.

 In this case, NLS cannot claim to be adversely affected even to the extent of requiring the Corporation to consider a new application, much less requiring approval of the request for refunding. Whatever uncertainties existed concerning the Corporation's policies at the time the refunding application was submitted, they were substantially cleared up during the proceedings before the hearing examiner. At least it became clear that the Corporation, contrary

---

3. Similarly, in *Lewis v. Weinberger*, 415 F.Supp. 652 (D.N.Mex.1976), also relied on by plaintiff, the agency's failure to publish violated both §§ 552 and 553.

to NLS's position, did not include seasonal workers in the definition of "migrants," but restricted the term to those who follow the growing seasons of crops, establishing residences at each agricultural site. And it also became clear that the Corporation required at least 10,000 migrants in a service area for a migrant workers grant. NLS may have known of these criteria prior to the hearing, but in any event had full opportunity at the hearing to present whatever evidence it had to show that it was entitled to refunding in accordance with the Corporation's criteria. Having heard all the evidence, the examiner concluded that there are approximately 7,000 migrants and dependents within the service area of NLS's Farmworker Division. Throughout the period of the hearing and continuing until after the President of the Corporation made his final determination, NLS continued to be funded. There is thus no basis to conclude that NLS has been adversely affected by lack of publication of the criteria for funding migrant worker programs. Accordingly, there is no basis under § 552 for a judgment requiring the Corporation to fund NLS's Farmworker Division.

However, plaintiff is entitled to an injunction requiring the Corporation to comply with the requirements of § 552(a)(1)(D), specifically, to publish in the Federal Register its statements of general policy concerning the definition of migrant worker and the number of migrant workers that must be within an applicant's service area in order to receive funding.[4]

Plaintiff would be entitled to no additional relief if the Corporation's obligations were tested against the publication requirements of § 2996g(e). Even if publication is required by § 2996g(e), there is no basis for reading into that provision a more rigorous sanction than that imposed by the "adversely affected" language of § 552.

Accordingly, judgment may enter (a) ordering the defendant to publish in the Federal Register with reasonable promptness its definition of "migrant worker" and its general policy concerning eligibility of legal service programs for migrant worker funds, and (b) denying the plaintiff's requests for relief in all other respects.

---

4. The need for clarity is best demonstrated by testimony at the hearing given by the Corporation's Director of Field Services. He first indicated that the definition of "migrant" that he used and that the Corporation used was the one contained in a report prepared for the Corporation by David Lillesand: "A migrant agricultural worker is a person who left home temporarily to do hired field or food processing work with the expectation of eventually returning home." The Director then added, "I don't have any problems with the Lillesand definition, except that it seems to me it is unacceptable in several means." (Hearing Tr. 173–74). Moreover, the Lillesand definition differs, at least in wording, though perhaps not in substance, from the definition used by the President of the Corporation in his final decision at p. 4, n.3.