**NATIONAL SENIOR CITIZENS LAW CENTER, INC., et al., Plaintiffs,**

v.

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**Civ. A. No. 83–3867.**

United States District Court, District of Columbia.

Jan. 31, 1984.

As Amended Feb. 2, 1984.

Richard Cotton, Kevin G. McAnaney, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., for plaintiffs.

Joel P. Bennett, Sherrill Spatz, Bennett, Deso, Greenberg & Thomas, Gene Potack, Laura Maria Castellanos, Legal Services Corp., Washington, D.C., for defendants.

Anthony Zell Roisman, Jawara K. Lumumba, Ellen J. Vargyas, Nat. Legal Aid and Defender Ass'n, Washington, D.C., for amicus curiae.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### Introduction

In this proceeding, 14 national support centers which receive funding under contracts with the Legal Services Corporation ("LSC" or "Corporation") seek to enjoin the LSC from enforcing Instruction 83–9 which restricts the use of funds appropriated by Congress for fiscal year ("FY") 1984. The Instruction, issued on December 1, 1983, was to become effective January 1, 1984. The effect of the Instruction is to require the national support centers to allocate no more than 10 percent of fiscal year 1984 LSC funds for direct representation in court (as sole counsel, co-counsel, amicus counsel, and of counsel), and before administrative and legislative bodies, including the presentation of written or oral testimony before such groups. The Instruction also provides that no 1984 LSC funds should be utilized for branch offices of national support centers.

The implementation of the Instruction was delayed when Judge Gesell of this Court entered a temporary restraining order on December 28, 1983. This Court continued the Order with the consent of the parties, pending a final ruling on plaintiffs' motion for a preliminary injunction.

After consideration of the legal memoranda and oral argument of counsel for the parties, various declarations, affidavits, depositions, and the entire record,[1] the Court finds that the plaintiffs have satisfied the requirements for the requested relief, and concludes that a preliminary injunction should issue. The reasons for that determination are set out in this Memorandum Opinion.

### FINDINGS OF FACT

1. The Legal Services Corporation Act of 1974 ("LSCA" or "Act"), 42 U.S.C. 2996 et seq., created the Legal Services Corporation "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. 2996b(a). The Corporation is a private nonprofit corporation.

1. Amici curiae briefs were filed on behalf of the Bar Association of San Francisco, the Boston Bar Association, the Chicago Council of Lawyers, the Washington Council of Lawyers, the Massachusetts Bar Association, the Los Angeles County Bar Association, the Hispanic National Bar Association, the National Legal Aid and Defenders Association, the Coalition for Legal Services, Inc., the Project Advisory Group, and organizations collectively referred to as "Sixty-Six Legal Services Field Programs."

2. Plaintiffs, the national support centers,[2] receive funding under contracts with the Corporation pursuant to the Act. The centers are independent private nonprofit corporations located throughout the United States. All the plaintiffs had annual contracts with the Corporation during 1983 which expired on December 31, 1983. Most of the plaintiffs are exclusively or predominantly funded by the LSC, and have received funds for as few as two years and as many as 17 years. The terms and conditions of plaintiffs' 1984 contracts with the Corporation are the subject of this litigation.

3. The defendants are the Legal Services Corporation and Donald Bogard, president of its board of directors. The Corporation is governed by an 11-member directorate appointed by the President of the United States with the advice and consent of the Senate. At present, a full board of directors has not been confirmed by the Senate.

4. One of the primary functions and activities of the Legal Services Corporation is to make grants and enter into contracts in order to maintain the independent entities that provide legal services to the indigent. The majority of the rules and regulations issued by the Corporation govern the terms and conditions of these grants and contracts. 45 C.F.R. Parts 1604, 1605, 1607 through 1613, 1615 through 1617, 1619 through 1621, and 1624.

5. Since the inception of the Legal Services program, the Federal government has recognized the need for two distinct but complementary components in the legal services delivery system. First, local legal services programs operate neighborhood offices and employ the front-line legal services lawyers who provide legal advice and representation to indigent clients on a day-to-day basis. Second, national support centers (and more recently state support centers) have developed specialized expertise in particular areas of the law affecting the poor (e.g., senior citizens' problems, housing, welfare, and consumer rights).

6. Recently, the defendants have aptly described the principal purposes of the national support centers as follows:

(1) To support legal services program staff and clients through individual service work, library and resource material, training, communications, the development of manuals and material, technical assistance and development of strategies for use by local program staff; (2) to undertake litigation, including serving as counsel for eligible clients and as co-counsel with local program staff; (3) to undertake legislative and administrative representation on behalf of eligible clients, including legislative representation before Congress; and (4) to coordinate and establish networks with local program staff, other support projects, other advocates and advocate organizations representing the poor.

48 Fed.Reg. 54305 (Dec. 1, 1983).

7. On December 1, 1983, the Corporation promulgated an Instruction in the Federal Register, to be effective January 1, 1984. The Instruction, No. 83–9, was published without notice and comment, and provides in part that:

2. No more than ten (10) percent of Fiscal Year 1984 LSC funds shall be allocated for networking, direct representation (i.e., sole counsel, co-counsel, amicus counsel, and of counsel in judicial, administrative, and legislative forums) and written or oral legislative or administrative testimony.

3. No Fiscal Year 1984 LSC funds shall be utilized for national support Center branch offices.

48 Fed.Reg. 54305 (Dec. 1, 1983).

8. The role of national support centers in fulfilling the statutory mandate of pro-

---

**2.** The 14 plaintiffs are the National Senior Citizens Law Center, Inc., the Center on Social Welfare Policy and Law, the National Consumer Law Center, Inc., the National Housing and Community Development Law Project, Inc., the National Health Law Program, Inc., the National Center for Immigrants' Rights, the Mental Health Law Project, the Center for Law and Education, the Indian Law Support Center, the Migrant Legal Action Program, the National Center for Youth Law, the National Veterans Legal Services Project, Inc., the National Social Science and Law Center, Inc., and the Food Research and Action Center.

viding legal services to the "financially unable" was the object of considerable and controversial congressional debate before the LSCA was enacted. Although Congress declined to prohibit the formation of national support centers, the "Green Amendment", authored by Congresswoman Green (R. Ore.), prohibited the Corporation from carrying out certain types of activity —research, training, technical assistance, and clearinghouse activities—by contract or grant, and required the Corporation to do these activities directly "in-house." *See* 119 Cong.Rec. H 20717 (daily ed. June 21, 1973).

9. Faced with the question of how to proceed in light of the Green Amendment, the Corporation in 1975 commissioned a study of the support centers which was chaired by Alexander Polikoff, a Chicago attorney. The study emphasized the importance of providing for direct client representation at the national support center level. Letter from Alexander Polikoff to President of the Legal Services Corporation (dated Feb. 16, 1976), attached as Exhibit C to plaintiffs' Post-Argument Memorandum (filed Jan. 21, 1984). As a result of the study, the Board adopted a resolution providing for funding of the centers which limited their activities to direct representation, among other functions. That resolution was published for comment, 41 Fed. Reg. 10271 (March 10, 1976), pursuant to 42 U.S.C. § 2996g(e), later finalized, 41 Fed.Reg. 17977 (April 29, 1976), and incorporated in the contracts of the centers.

10. In 1975, the Congress again debated the role of the national support centers and considered a bill, H.R. 10799, 94th Cong., 1st Sess., to repeal the Green Amendment. *See* H.R.Rep. No. 310, 95th Cong., 1st Sess. (1977) at 5 U.S.Code Cong. & Admin.News 1977, 4503. Congress ultimately repealed the Green Amendment restriction that required the Corporation to carry out certain support activities directly. Pub.L. 95–222, 91 Stat. 1619 (1977).

11. In December 1977, a study entitled "Survey of Legal Services Resource Needs: Final Report" was prepared by the Bureau of Social Science Research for the Corporation. Plaintiffs' Exhibit H–5, Document 4–41.[3] The objective of the study was to determine the resource needs of legal services attorneys in substantive law areas. The study found that 28 percent of the 741 attorneys who responded to the survey needed assistance from outside co-counsel, that 13 percent were unable to obtain such assistance, and the majority of those who were able to obtain assistance found it from other LSC programs. *Id.* at 47, Figure III–C. The study concluded that the resource needs of most legal services attorneys were being met, in large part through the efforts of the national support centers. *Id.* at 82.

12. In 1978, LSC published a study entitled "Support: Policies and Options for 1979 and Beyond." The study declined to set blanket priorities among the functions served by the national support centers, recognizing that needs and priorities will differ from center to center. Plaintiffs' Exhibit H–2, Document 4–7 at 16. Nevertheless, it expressly provided that special emphasis be given to "national policy support and representation," and voiced the "presumption that most national support centers should have some kind of Washington presence." *Id.* at 21–22. The conclusions of the 1978 study were reiterated in the 1979 and 1981 evaluations of the centers undertaken by the Corporation (Rosenthal, "Overview Report on National Support Center Evaluations" (November 1979), Plaintiffs' Exhibit H–7 at 3, 18–19; Hartley Dec. at 10), and in a background paper prepared by the LSC. "A Background Paper on National Support Centers," Plaintiffs' Exhibit H–2, Document 4–8 at 12–13. Both evaluations praised the centers' direct representation activities and the work of their Washington offices, and encouraged them to expand these efforts.

**3.** The deposition of Gregg Hartley, the Director of the Office of Field Services ("OFS") of the LSC, was filed with the Clerk on January 18, 1984. Plaintiffs' exhibits bearing the letter "H" are attached to the Hartley deposition, and the Hartley deposition is cited as "Hartley Dep."

13. One month later, after extensive discussion at a Board meeting, the LSC Board of Directors ordered the staff to conduct a study of the activities of the national support centers. *See* Transcript of December 17, 1983, Board Meeting at 82–98, 122–46, 183 (filed January 17, 1984). That study was directed to the precise issues addressed in Instruction 83–9. *See* Attachment to January 6, 1983 letter from Donald P. Bogard to Henry Freedman, ¶¶ 2, 9, 10, 12, attached as Appendix B to Plaintiffs' Memorandum in Support of Application for Temporary Restraining Order and Preliminary Injunction (filed Dec. 27, 1983). The study was in draft form at the time the Instruction was issued, and the Board has neither approved nor disapproved its findings. Hartley Dep. at 158–59.

14. On December 21, 1982, Congress attached an amendment in the nature of an "affirmative rider" to a FY 1983 Legal Services Corporation funding measure. The rider directed the Corporation to maintain FY 1983 funding of its current grantees and contractors at the level at which they were funded in 1982 "until action is taken by directors of the Corporation who have been confirmed in accordance with Section 1004(a)" of the LSC Act. H.J.Res. 631, Pub.L. 97–377. Essentially identical language has since been incorporated into two subsequent continuing resolutions, Pub.L. 98–107 and Pub.L. 98–151. Most recently, this affirmative rider was re-enacted for a fourth time as part of the FY 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary, and related agencies, Pub.L. 98–166, 97 Stat. 1071 (1983), which governs the 1984 funds to be provided to the plaintiffs by the defendants.

15. The above materials were reviewed by the LSC staff before and during the development of the Instruction. This process was supervised by Gregg Hartley, when he assumed his position with OFS in March of 1983. He was assisted by Gene Potack, who began working with the Corporation in October 1983, less than two months before the Instruction was published.

16. Despite the volume of documents involved in the review,[4] the written record supporting the Instruction and the post-hoc explanations for the Instruction are extremely scant. The written record consists of two documents: a five-page memorandum from Potack to Hartley, dated November 17, 1983, Plaintiffs' Exhibit H–5, Document 4–38, and the Instruction itself, which essentially paraphrases portions of the memorandum. Moreover, the declarations submitted by Potack and Hartley *after* the start of this litigation contained only very general references to the LSC materials they reviewed. Potack Dec. at ¶¶ 10, 13, 18; Hartley Dec. at ¶¶ 8, 9, 12.

17. The memorandum sets forth Potack's opinions about the allocation of funds between the four functions performed by the centers and the utility of the D.C. branch offices:

> What is clear today, *in my opinion*, is that field attorneys primarily need advice and consultation, training, library and resource material, manuals, and other support services mentioned in function # 1 above and are far less likely to list function # (s) 2, 3, or 4 as important needs. (Emphasis added).

*Id.* at 2.

The recommendation to prohibit the use of 1984 LSC funds for branch offices

> is based *entirely on [his] belief* that support centers theoretically serving the entire country with LSC budgets of $500,000 or less cannot justify the additional overhead expenses of branch offices. (Emphasis added).

*Id.* at 2.

Finally, Potack concludes that:

---

**4.** Hartley has described the material that he and Potack reviewed as "voluminous," Hartley Dec. at ¶ 6, and has stated that it occupied approximately five feet of bookshelf space. Hartley Dep. at 91, Plaintiffs' Exhibit H–2 through H–5.

It would therefore be irresponsible not to reverse past LSC "policy."

*Id.* at 2.[5]

The memorandum was written prior to the Corporation's receipt of the 1984 funding applications from the national support centers, which included each center's division of funding between the four functions. Hartley Dep. at 189.

18. Hartley has stated that he did not take any notes or write any memoranda concerning his review of the "voluminous" materials, Hartley Dep. at 52, 56, and he was unable to recall the specific findings of many of these documents. *Id.* at 137–38, 155–56, 165–68. Shortly after the Potack memorandum was written, Hartley spent one day reviewing the funding applications submitted by the national support centers, consisting of approximately 600 to 700 pages of material, and discussed the Instruction with Bogard the following day. Bogard approved the Instruction on November 28, 1983, and it was sent to the Federal Register for publication on November 29, 1983. The Corporation attempted to put the Instruction into effect through contract extension offers, which were included in letters sent to the plaintiffs in January 1984. Illustrative of these contract extension offers is a letter, dated January 4, 1984, attached to the pleading entitled "Defendant's Position With Respect to Preserving the Status Quo." *See also* Transcript of Hearing on Motion for An Order to Show Cause, January 16, 1984, at 12, 16–19. The letters proposed to extend the plaintiffs' contracts through December 31, 1984, and incorporated the Instruction in modifications 1, 2, 4, 5 to those contracts. The letters also included checks made out to the plaintiffs, representing one-sixth of the amount due under the 1984 contracts. The language of the letters provides that by either executing the proposed contract or by expending 1984 funds, the plaintiffs are bound by the LSC modifications.

---

**5.** Hartley has also testified that he sought Bogard's approval of the Instruction precisely be-

## LEGAL ANALYSIS

### *The Standard for Injunctive Relief*

The standard for injunctive relief is well-established in this Circuit, as set forth in *Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958), and refined in *Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 844 (D.C.Cir.1977). Under this standard, a preliminary injunction is appropriate:

> When a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.

*Holiday Tours,* 559 F.2d at 844.

### A.

### *Serious Legal Question and Substantial Likelihood of Success on the Merits*

Three of the plaintiffs' causes of action warrant particularly close scrutiny under the first element of the *Holiday Tours* analysis: the Instruction is invalid because it was not afforded notice and comment, the Instruction is contrary to the congressional mandate of Pub.L. 98–166, and the Instruction is arbitrary and capricious and lacks a rational basis.

### *1.*

First, the Court considers the plaintiffs' contention that Instruction 83–9 is invalid because it was not subject to notice and comment rulemaking pursuant to 42 U.S.C. § 2996g(e). That section provides:

> The Corporation shall afford notice and reasonable opportunity for comment to all interested parties prior to issuing rules, regulations, and guidelines, and it shall publish in the Federal Register at least 30 days prior to their effective date all its rules, regulations, guidelines and instructions.

Thus, the issue before the Court is whether Instruction 83–9 is in actuality an Instruc-

---

cause it constituted a "major direction [change]." Hartley Dep. at 38–39.

tion, which need only be published in the Federal Register at least 30 days prior to its effective date, or a rule, regulation or guideline, which must also be afforded notice and opportunity for comment.[6]

■ Since the LSCA does not provide independent definitions for these terms, the similar provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the case law interpreting the APA are instructive guides in analyzing LSC promulgations. *See United States v. Porter,* 591 F.2d 1048, 1053 (5th Cir.1979). Under the APA, agency announcements which are determinative of private interests are accorded the opportunity for notice and comment, while non-binding rules are not accorded this opportunity. *Batterton v. Marshall,* 648 F.2d 694, 701–02 (D.C.Cir. 1980), *cited with approval in Lamoille Valley Railroad Co. v. ICC,* 711 F.2d 295, 328 (D.C.Cir.1983). Non-binding rules are agency statements which tentatively interpret the meaning of a statute or govern internal housekeeping measures. *Id.* at 702. In contrast, binding rules "grant rights, impose obligations, or produce other significant effects on private interests." *Id.* at 701–02. Thus, an agency methodology which affects federal funding levels is subject to notice and comment under the APA. *Id.* at 708.

■ When the LSC Instruction is analyzed in this manner, plaintiffs have made a strong showing that it should be subject to notice and comment.[7] The Instruction

significantly affects the centers' interests by placing severe constraints on their expenditure of federal funds, and providing for termination of their contracts if those constraints are not adhered to. The LSC's recent decision to forego rulemaking is entitled to little deference for the reason that the interpretation is not longstanding, and the notice and comment provision is a procedural statute which does not require the exercise of agency expertise. *American Postal Workers' Union, AFL–CIO v. United States Postal Service,* 707 F.2d 548, 561 n. 9 (D.C.Cir.1983). Moreover, in past years, the Corporation has itself concluded that an announcement which similarly limited the discretion of the national support centers was subject to notice and comment rulemaking. *See* 41 Fed.Reg. 10271 (March 10, 1976).[8] Thus, the Court concludes that Instruction 83–9 is subject to notice and comment pursuant to 42 U.S.C. § 2996g(e).[9]

*2.*

Second, plaintiffs contend that Instruction 83–9 is invalid because it is contrary to the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1984, Pub.L. 98–166, 97 Stat. 1071 (1983), and should be enjoined. The relevant text of Pub.L. 98–166 provides:

> the funds appropriated in this Act ... shall be used by the Corporation ... so

**6.** It is self-evident that an agency cannot determine the characterization of an announcement merely by labelling it in a given way. Instead, the Court must look behind the agency's description in order to determine its substantive effect. *Environmental Defense Fund, Inc. v. Gorsuch,* 713 F.2d 802, 816 (D.C.Cir.1983).

**7.** Section 2996g(e) should be interpreted at least as broadly as § 553 of the APA for the reason that the APA subjects only "rules" to comment, while the LSC includes "rules, regulations and guidelines" within its sweeping provisions. Moreover, the LSC does not specify a detailed list of exceptions to public comment, as does the APA, 5 U.S.C. §§ 553(b)(3)(A), 553(b)(3)(B). *Cf. Neighborhood Legal Services v. Legal Services Corp.,* 466 F.Supp. 1148 (D.Conn.1979). In any event, the APA exceptions have been narrowly

construed. *See, e.g., Center for Auto Safety v. Tiemann,* 414 F.Supp. 215 (D.D.C.1976), remanded on other grounds, 580 F.2d 689 (1978).

**8.** The APA-created exemption of grants from notice and comment rulemaking is not adopted in the LSC. This conclusion is confirmed by the text of Pub.L. 98–166, *infra,* which strongly suggests that grant conditions are promulgated by "regulations, guidelines and rules," which are subject to notice and comment.

**9.** The Court does not rule today that any LSC announcement which governs the expenditure of funds by the national support centers is subject to notice and comment, and the legality of the publication of previous instructions by the LSC is not before the Court.

as to insure that total annual funding for [current grantees] is maintained in the same proportion which total appropriations to the Corporation in [ ] 1984 bear to the [1983 appropriations], unless action is taken by directors of the Corporation prior to January 1, 1984, who have been confirmed in accordance with section 1004(a) of the [LSCA] . . .

This language is identical in all material respects to three earlier appropriation statutes, first enacted in December of 1982 as an affirmative rider to a fiscal year 1983 legal services funding measure, Pub.L. 97–377, 96 Stat. 1874 (1982). *See* H.R.Rep. No. 478, 98th Cong., 1st Sess. (1983) at 34. The other appropriation statutes are Pub.L. 98–107, 97 Stat. 733, 739–40 (1983) and Pub.L. 98–151.

The legislative history of Pub.L. 97–377, the earliest version of the 1984 appropriation rider, establishes that the 1983 appropriation measure was intended both to preserve the funding levels of the grants received by the national support centers and to maintain the same terms and conditions for those grants. According to the conference report:

> [t]he conferees intend that such funding shall be provided under grants and contracts containing the *same terms and conditions* now in effect for each said grantee . . .

H.R.Rep. No. 980, 97th Cong., 2d Sess. (1982) at 171 (conference report) (Emphasis added).

■ Although the defendants admit that the 1983 appropriation enactments prohibited a decrease in the funding of the national support centers, they contend that the 1984 enactment does not similarly preclude a change in the terms and conditions of the 1984 grants. They argue that the absence of the phrase "terms and conditions" in the legislative history of the 1984 measure means that Congress did not intend to regulate the terms and conditions of the 1984 LSC grants. Apart from this omission in the legislative history of Pub.L. 98–166, the defendants have presented no other evidence supporting this view. Under these circumstances, the language and legislative history of an earlier enactment is a useful guide to interpreting a later enactment. *United Shoe Workers of America, AFL–CIO v. Bedell,* 506 F.2d 174, 183, 185 (D.C. Cir.1974) (court gave weight to administrative construction of earlier statute in interpreting subsequently enacted statute).

Here, the legislative history of the 1983 measure clearly states that the funding for the national support centers must be maintained under the same terms and conditions. H.R.Rep. No. 980 at 171. This history, coupled with floor statements made during the passage of the subsequent enactments, suggests that Congress meant to continue the 1983 restrictions. For instance, during the debate preceeding passage of Pub.L. 98–107, Congressman Conte (R. Mass.), a manager of the bill in the House of Representatives, stated that: "[l]anguage included in the conference report places exactly the same restrictions on the Corporation that are now in place." 129 Cong.Rec. H7813 (daily ed. Sept. 30, 1983). During the Senate debate on Pub.L. 98–166, Senator Rudman (R. N.H.) stated that the "affirmative rider [of the earlier bills] is retained," 129 Cong.Rec. S14446 (daily ed. Oct. 21, 1983), and Senator Hatch (R. Utah) complained that the LSC is "[restricted] from engaging in traditional funding decisions even where such decisions are not controversial." *Id.*

*3.*

A third ground advanced for preliminary relief is that the Instruction is arbitrary and capricious. The plaintiffs point to the inadequate written record which supports the Corporation's major departure from past practice, and the lack of a rationale to support this change. They correctly assert that the Potack memorandum and the preamble to the Instruction comprise the LSC's written record of the development of the Instruction prior to the onset of this litigation. Although the defendants do not deny that the Instruction represents an abrupt change in the Corporation's view of the role of the national support centers,

they assert that the LSC "had no obligation whatsoever to assemble an APA type rule-making record." Transcript, Preliminary Injunction hearing of January 19, 1984 at 63.

■ While it is true that the Corporation's decisions do not have to meet the requirements of the APA *per se*, the LSC must, at a minimum, articulate a rational basis for its administrative decisions. *Spokane City Legal Services v. Legal Services Corporation*, 614 F.2d 662, 669 (9th Cir. 1980) (construing 42 U.S.C. § 2996d(e)(1)). *Compare San Juan Legal Services, Inc. v. Legal Services Corporation*, 655 F.2d 434, 439 (1st Cir.1981) (court declined to decide appropriate standard of review in upholding LSC decision terminating funding of grantee). In some instances, an arbitrary and capricious standard of review has been applied to administrative action which is not subject to the APA. *See Baltimore & Annapolis Railroad Co. v. Washington Metropolitan Area Transit Commission*, 642 F.2d 1365, 1370 (D.C.Cir.1980) (court vacated arbitrary and capricious agency action).[10] Under either standard of review, the evidence in this case raises serious doubts that the promulgation of the Instruction was based on a reasoned decision by the Corporation.

First, the written record does not provide any support for the LSC decision to curtail the direct representation function. Gene Potack and Gregg Hartley, the two individuals chiefly responsible for the Instruction, have provided only vague, nonspecific references to the documents on which they rely for this decision. There is no indication that the cost of providing direct litigation services justifies their curtailment. At most, the declarations indicate that they reviewed a large amount of material in preparing the Instruction, which itself suggests that a comparative analysis of those documents was necessary. The declarations fail to suggest such an analysis, and provide no explanation for this abrupt change in the Corporation's policy. Even if these declarations are not post-hoc administrative rationalizations, *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), they do not provide a reasoned basis for the LSC decision.

Second, the percentage restrictions contained in the Instruction are not supported by the survey which indicates that 28 percent of the legal services lawyers surveyed needed the assistance of co-counsel from outside the local office. 1977 survey at 47, Figure III–C. Indeed, the availability of co-counsel from the national support centers apparently explains the degree of additional need for these services. *Id.* Even if a minority of lawyers would require these services in the absence of national support center assistance, the written record and the declarations do not discuss the correlation between the need for direct litigation support and the relative cost of providing these services. If the provision of direct litigation support costs substantially more than the provision of library and research support, the limitations in the Instruction lack a rational explanation.

■ Third, even if some percentage restrictions are warranted under the defendants' interpretation of the studies and surveys, the record provides no support for the particular restrictions that were chosen.[11] When an agency establishes percentage restrictions in reliance on data or theory, these percentage restrictions must be correlated with the available evidence. Specific percentage restrictions which follow from data which could justify a variety of percentage restrictions are incompatible with reasoned decision making. *San Antonio, Texas v. United States*, 631 F.2d 831, 851–52 (D.C.Cir.1980).

---

**10.** The requirement of a rational basis standard for LSC decisions may not differ significantly from the "arbitrary and capricious" standard set forth in the APA. Id. n. 11, *citing O'Beirne v. Overholser,* 193 F.Supp. 652, 656 (D.D.C.), rev'd on other grounds 302 F.2d 852 (D.C.Cir.1961).

**11.** The Instruction is questionable on its face because it requires that no more than 10 percent of LSC funds be devoted to three of the four functions served by the national support centers, while the fourth function receives 90 percent of the available funds.

■ Fourth, the Instruction is irrational because the prohibition governing the use of LSC funds for branch offices is based solely on the staff's opinions about the overhead expenses of centers with less than $500,000 of LSC funding, Potack memorandum at 3; 48 Fed.Reg. 54305, but the prohibition extends to all of the national support centers. Presumably, a limitation which is based on certain minimum funding amounts should be limited to centers who receive less than this minimum amount.[12] In addition, the defendants' suggestion that the overhead expenses of branch offices are an inefficient use of resources is not supported by the record because the LSC had not received information about these overhead expenses when the Instruction was promulgated. Hartley Dec. at ¶¶ 32, 35; Hartley Dep. at 185–189; Plaintiffs' Exhibit H–5, Document 4–48.

■ These omissions are particularly troubling because the Instruction enforces broad sweeping changes in past LSC policy. Where an agency reverses its prior practice, it is particularly important that it provide an adequate explanation for the change. *Washington Metropolitan Area Transit Commission*, 642 F.2d at 1370. The Corporation's failure to provide such an explanation is an additional reason to enjoin the Instruction pending final disposition of the case on its merits.

## B.

### *Irreparable Injury*

■ The second factor relevant to the issuance of a preliminary injunction is whether the plaintiffs can show that absent such relief they will suffer irreparable injury. *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925. Before issuing an injunction, the Court must find that the plaintiffs have been harmed and determine that compensatory relief or money damages at a later date would not provide adequate compensation for these injuries.

The Instruction harms the plaintiffs by forcing them to cut back on current client responsibilities,[13] to decline new direct litigation commitments,[14] and to forego representing clients before legislative and administrative forums.[15] The declarations of field attorneys show that this assistance is essential to provide adequate representation of legal services clients,[16] and other declarations indicate that outside resources are insufficient to meet this need.[17]

The national support centers will also suffer injury as the result of the prohibition of the use of LSC funds for branch offices. The unavailability of LSC funding would require the plaintiffs to cease all or most of their branch office activities within

---

12. Only three support centers with branch offices had funding which did not exceed $500,000 in 1983. Hartley Dec. at ¶ 32; Exhibit 5. Two of those centers will receive LSC funding in excess of $500,000 for 1984. Defendants' suggestion that these centers may not be able to justify branch offices is irrelevant to the issues in this case. The point is that these plaintiffs are not included in the reason which the defendants give for the branch office provision, and the LSC has advanced no other reasons in support of such a restriction.

13. Five national support centers have filed declarations stating that their pending litigation commitments already exceed the 10 percent limitation. Declarations of Burton Fretz (Director, National Senior Citizens Law Center) at ¶ 7; David Madway (Executive Director, National Housing and Community Development Law Project) at ¶ 5; Henry Freedman (Director, Center on Social Welfare Policy and Law) at ¶ 9; Sylvia Ivie (Director, National Health Pro-

gram) at ¶ 10; John O'Toole (Director, National Center for Youth Law) at 4. At least three of these centers already have existing commitments which exceed 25 percent of their LSC funds. Declarations of Fretz at ¶ 7; Freedman at ¶ 9; O'Toole at 4.

14. Declarations of Linton Joaquin (Acting Director, National Center for Immigrants' Rights) at 6; Madway at 5–6; Ivie at 17.

15. Declarations of Ivie at 17; Madway at 6–7.

16. Declarations of Janet Parrish (Staff attorney, Community Legal Services Energy Project, Philadelphia, Penn.) at ¶ 5; Elisabeth Youngerman (Staff attorney, New Haven Legal Assistance Association Conn.) at 1; Jonathan Stein (Executive Director, Community Legal Services, Philadelphia, Penn.) at ¶ 9.

17. Declarations of Fretz at ¶¶ 5, 7; Freedman at ¶¶ 14, 16.

a few months time,[18] and funds from other sources are insufficient to alleviate this harm.[19] This is a very real harm in view of the need of local legal services offices for access to the expertise of these Washington offices.[20]

Moreover, the harm suffered by the plaintiffs is irreparable because money damages cannot adequately compensate them for their immediate withdrawal from ongoing litigation or their inability to accept new litigation responsibilities.[21] At a minimum, the plaintiffs would have to make significant, possibly irreversible, changes in their litigation procedures and the operations of their offices in order to comply with the Instruction. The withdrawal of national support center attorneys from pending court actions would entail serious consequences even if the lawyers involved were to later rejoin these actions. Similarly, the problems presented by the closing of the Washington offices could not be solved by the provision of additional funds in the future. Under these circumstances, plaintiffs have met the threshold requirements of irreparable harm. *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 527–28 (3rd Cir.1976) (allegations of significant change in company's operations and inability to pay debts relevant to irreparable injury).

## C.

### *Harm to Other Interested Persons or the Public*

Under the third element of the *Holiday Tours* analysis, the court must examine the harm to the defendants and to other interested persons, as well as the public interest. This is required in order to determine whether the equities favor the issuance of a preliminary injunction. In this case, preliminary relief will require the defendants to maintain a course of conduct that they have pursued for many years, and will at most affect the expenditure of federal funds over a twelve-month period. The Corporation has never before restricted the use of LSC funds for direct litigation or branch offices, and therefore, an order maintaining the status quo will cause LSC little, if any, harm.

Moreover, a preliminary injunction is in the public interest because it carries out the intent of Congress that no significant changes should be made in LSC grants until a full Board of Directors is confirmed by the Senate. A preliminary injunction also enables legal services attorneys to meet their ongoing client responsibilities, and to provide additional services to "persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). It is worthy of note that numerous voluntary bar associations and legal services offices have filed amicus briefs pointing to the public interest served by an injunction. Not a single legal services office has filed an objection to the requested preliminary relief.

## CONCLUSION

■ In this case, the plaintiffs have demonstrated all the required elements for the issuance of an order maintaining the status quo. Based on the foregoing, the balance of equities favors the grant of a preliminary injunction pending final disposition of the case on its merits. An appropriate order consistent with this opinion will be entered.

**18.** Declarations of Robert Sable (Executive Director, National Consumer Law Center) at ¶ 17; Madway at ¶ 9; Ivie at ¶ 18; Fretz Deposition (filed January 18, 1984) at 69–70.

**19.** Declarations of Sable at ¶¶ 17, 18; Madway at ¶ 9.

**20.** Declarations of Marilyn Melkonian (former Deputy Assistant Secretary of the Department of Housing and Urban Development) at ¶ 19; Christopher St. John (Staff attorney, Pine Tree Legal Assistance, Maine) at ¶ 8; Stein at ¶ 3; Freedman at 11; Sable at ¶¶ 14, 20; Ivie at ¶¶ 12–13.

**21.** The possibility of LSC waiver of the 10 percent limitation to permit the expenditure of 25 percent of LSC funds is just that—a mere possibility. See 48 Fed.Reg. 54306. This possibility does not refute plaintiffs' assertions of irreparable harm.

## ORDER OF PRELIMINARY INJUNCTION

This case came on to be heard on plaintiffs' motion for a preliminary injunction and defendants' opposition thereto. Upon consideration of the papers and arguments in support of and in opposition to the motion, the Court finds and concludes: (1) that there is a substantial likelihood that plaintiffs will succeed on the merits of their suit; (2) that defendants' actions, if not enjoined, will cause grievous and irreparable injury to plaintiffs and to the clients and field lawyers whom they serve; (3) that issuance of this preliminary injunction will cause no irreparable injury to defendants; and (4) that the public interest is best served by issuance of this preliminary injunction. Therefore,

IT IS HEREBY ORDERED that the effective date of the Instruction published at 48 Fed.Reg. 54305 (December 1, 1983), is stayed, *pendente lite,* until further order of the Court and that the Defendants, their agents and employees are enjoined, *pendente lite,* from enforcing directly or indirectly any limitation or restriction on funding provided by Legal Services Corporation to the national support centers stated therein.

IT IS FURTHER ORDERED THAT;

(1) the effective date of modifications 1, 2, 4 and 5 to the plaintiffs' 1983 contracts proposed in defendants' offers of contract extensions is hereby stayed, *pendente lite,* and the defendants, their agents and employees are enjoined from directly or indirectly enforcing said modifications until further order of the Court;

(2) the defendants are enjoined from enforcing any provision in the contract extension offers to plaintiffs which assert that contract modifications 1, 2, 4 and 5 can ever become effective with respect to the period covered by the previous restraining orders or by this preliminary injunction;

(3) the defendants are enjoined from holding plaintiffs accountable for purposes of LSC Instruction 83–9 for expenditures made during 1984 as the result of new client commitments undertaken during the period covered by the previous restraining orders or by this preliminary injunction.

Nothing in this Order shall be construed to prevent the Legal Services Corporation from requiring the national support centers to comply prospectively with Instruction 83–9 in the event that such Instruction is held to be valid in this action, from and after the date of any such order. Notwithstanding any other provision in this Order the Corporation shall have the right to deem Instruction 83–9 to have been in effect since January 1, 1984 for the sole purpose of determining the effective date of such Instruction for purposes of application of 45 C.F.R. § 1606.4, in the event that such Instruction is ultimately held to be valid in this action.