**NATIONAL SENIOR CITIZENS LAW CENTER, et al.**

v.

**LEGAL SERVICES CORPORATION, et al., Appellants.**

**No. 84–5133.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 1984.

Decided Jan. 11, 1985.

MacKinnon, Senior Circuit Judge, concurred specially and filed opinion.

Joel P. Bennett, Washington, D.C., with whom Eric J. Branfman and Sherrill R. Spatz, Washington, D.C., were on the brief for appellants.

Richard Cotton, Washington, D.C., with whom Susan J. Herdina, Washington, D.C., was on the brief for appellees.

Ralph S. Tyler, III, Baltimore, Md., was on the brief for the Atty. Gen. of the State of Md., amicus curiae urging affirmance.

Michael B. Trister, Washington, D.C., was on the brief for Nat. Organization of State Support Units, amicus curiae urging affirmance.

Walker T. Thompson, Washington, D.C., was on the brief for Nat. Legal Aid and Defender Ass'n, et al., amicus curiae urging affirmance.

Walker T. Thompson was on the brief for Nat. Legal Aid and Defender Ass'n, et al., amicus curiae urging affirmance.

Charles Stephen Ralston, New York City, was on the brief for NAACP Legal Defense and Educational Fund, Inc., amicus curiae urging affirmance.

Before MIKVA and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

Concurring opinion filed by Senior Circuit Judge MacKINNON.

GINSBURG, Circuit Judge:

From its earliest days, the national legal services program has enlisted the aid of specialized national support centers. Each center—currently there are seventeen—concentrates on a specific subject area (for example, welfare, housing, and health law) or a specific client group (for example, older Americans, native Americans, immigrants, and migrant workers). At present, the centers are exclusively or predominantly funded by the Legal Services Corporation (LSC or Corporation). Since their inception in 1966, the centers have served four principal functions:

(1) Support of legal services program staff and clients through individual service work, library and resource material, training, communications, the development of manuals and material, technical assistance and development of strategies for use by local program staff;

(2) Litigation, including serving as counsel for eligible clients and as co-counsel with local program staff;

(3) Legislative and administrative representation on behalf of eligible clients, including legislative representation before Congress; and

(4) Coordination and establishment of networks [co-operative arrangements] with local program staff, other advocates and advocate organizations representing the poor.

*See* 48 Fed.Reg. 54,305 (1983).

On December 1, 1983, LSC announced a "major direction change[ ]"[1] in its policy toward national support centers. The change was ordered in a *Federal Register* notice labeled "LSC Instruction 83–9." Grant Conditions for National and State Support, 48 Fed.Reg. 54,305 (1983). Instruction 83–9 directed the centers, with limited leeway for waivers, to allocate at least 90% of their fiscal year 1984 LSC funds to the first of the four above-listed functions, and no more than 10% to the remaining three functions:

> No more than ten (10) percent of Fiscal Year 1984 LSC funds shall be allocated for networking, direct representation (i.e., sole counsel, co-counsel, amicus counsel, and of counsel in judicial, administrative, and legislative forums) and written or oral legislative or administrative testimony.

*Id.* at 54,305–06. In addition, the Instruction prohibited national centers from using fiscal year 1984 LSC funds to support branch offices. *Id.* at 54,305.

Instruction 83–9 is the target of this litigation commenced by fourteen national support centers against LSC. The centers maintain, inter alia, that Congress has constantly proscribed LSC alteration of center grants so long as recess appointees, rather than Senate-confirmed directors, govern LSC. The district court, on December 28, 1983, granted a temporary restraining order blocking implementation of the Instruction. That order was continued, by consent, until January 31, 1984, when the district court issued the preliminary injunction, *National Senior Citizens Law Center, Inc. v. Legal Services Corp.*, 581 F.Supp. 1362 (D.D.C.1984), from which LSC now appeals.[2]

We affirm the district court's order. Instruction 83–9, we hold in agreement with the district court, violated a constraint Congress placed on the Corporation in the fis-

cal year 1984 LSC appropriations rider. In no respect, we conclude, did the district court abuse its discretion in staying the direction change Instruction 83–9 was designed to accomplish.

## I. FACTS

### A.

Eight years after the Office of Economic Opportunity initiated federally financed civil legal assistance for the poor, Congress enacted the Legal Services Corporation Act of 1974 (LSC Act), Pub.L. No. 93–355, 88 Stat. 378 (codified as amended at 42 U.S.C. §§ 2996–2996*l* (1982)). The Act established LSC as a private non-profit corporation, funded by congressional appropriations; LSC's mission is to support a national civil legal services program through grants to and contracts with independent entities that provide "legal assistance to eligible clients." LSC Act § 1006(a)(1)(A), 42 U.S.C. § 2996e(a)(1)(A). Pursuant to this statutory directive, LSC now funds approximately 320 local legal services programs, state support centers in most states, and seventeen national support centers. The national centers receive their funds through annual contracts with the Corporation.

Congress provided for the governance of LSC by an eleven-member board of directors appointed by the President with the advice and consent of the Senate. LSC Act § 1004(a), 42 U.S.C. § 2996c(a). Since the end of December 1981, however, the Corporation has been governed by a succession of recess appointees. *See* Appellees' Updated Statement of Facts (Dec. 12, 1984), *McCalpin v. Durant*, No. 82–2318 (D.C. Cir. argued Oct. 20, 1983). In response to the Executive's recourse to recess appointments, Congress has resorted to appropriations riders to place restrictions on LSC. The restriction central to this case first appeared when Congress appropriated

---

**1.** Deposition of Gregg L. Hartley at 38, *National Senior Citizens Law Center, Inc. v. Legal Servs. Corp.*, 581 F.Supp. 1362 (D.D.C.1984).

**2.** A little more than a month later, the district court issued a similar injunction against LSC's

refusal to renew the regional training grants of four state support centers. *Massachusetts Law Reform Inst. v. Legal Servs. Corp.*, 581 F.Supp. 1179 (D.D.C.), *aff'd mem.*, 737 F.2d 1206 (D.C. Cir.1984).

funds for LSC for fiscal year 1983. Congress specified:

> [T]he funds appropriated in this Act for the Legal Services Corporation shall be used by the Corporation in making grants or entering into contracts ... *so as to insure that funding for each such current grantee and contractor is maintained* in 1983 at the annualized level at which each such grantee and contractor was funded in 1982, or in the same proportion which total appropriations to the Corporation in fiscal year 1983 bear to the total appropriations to the Corporation in fiscal year 1982, until action is taken by directors of the Corporation who have been confirmed in accordance with section 1004(a) of the Legal Services Corporation Act ....

Further Continuing Appropriations Act, 1983, Pub.L. No. 97–377, 96 Stat. 1830, 1876 (1982) (emphasis added). The accompanying House Report clarified the restraint's scope and purpose: LSC was required not only to fund current grantees at levels equal or proportional to those prevailing in fiscal year 1982, but also to provide such funding "under grants ... containing the same terms and conditions now in effect for each said grantee." H.R. REP. No. 980, 97th Cong., 2d Sess. 171 (1982). Congress, still looking toward the day when an LSC board of directors confirmed by the Senate is in place, has several times reenacted the funding restraint set out above. *See* Pub.L. No. 98–107, § 101(g), 97 Stat. 733, 739–40 (1983); Pub.L. No. 98–151, § 101(e), 97 Stat. 964, 973 (1983) (keeping Public Law 98–107 in effect); Pub.L. No. 98–166, 97 Stat. 1071, 1088 (1983); Pub.L. No. 98–411, 98 Stat. 1545, 1563 (1984).

### B.

Support centers are an integral part of the legal services program. As the district court observed:

> [T]he Federal government has recognized the need for two distinct but complementary components in the legal services delivery system. First, local legal services programs operate neighborhood offices and employ the front-line legal services lawyers who provide legal advice and representation to indigent clients on a day-to-day basis. Second, national support centers (and more recently state support centers) have developed specialized expertise in particular areas of the law affecting the poor ....

581 F.Supp. at 1365. Because LSC evaluations in the years 1978–1982 indicated that program needs differed from center to center, the Corporation in past years imposed no uniform priorities or plan of operations on the centers. *Id.* at 1366. Among center functions, however, *see supra* p. 1392 LSC emphasized "national policy support and representation"; in addition, the Corporation noted the desirability of "some kind of Washington [, D.C.,] presence." 581 F.Supp. at 1366. Summarizing LSC's 1978 study and 1979 and 1981 evaluations, the district court stated that the Corporation "praised the centers' direct representation activities and the work of their Washington offices, and encouraged them to expand these efforts." *Id.*

### C.

Against this background of congressional containment of action by an unconfirmed LSC board and support center involvement in representation concerning national law or policy, a pair of LSC staff members proceeded with a review that eventuated in Instruction 83–9. The overall supervisor was Gregg Hartley, a nonlawyer who began serving LSC as Director of the Office of Field Services in March 1983. Hartley's principal assistant was Gene Potack, a lawyer who joined the Corporation's staff in October 1983, less than two months before LSC's publication of the Instruction. Together, the pair made inquiries and looked at material Hartley described as occupying approximately five feet of bookshelf space. *Id.* at 1367 & n. 4.

The Hartley-Potack review persuaded the two collaborators to recommend to Donald P. Bogard, President of LSC, an immediate "major direction [change]" constituting a "revers[al of] past LSC 'poli-

cy.' " *Id.* at 1368 & n. 5. The change, embodied in the challenged Instruction, reflected Potack's opinion that field attorneys primarily need aid of the kind listed first among center functions, *see supra* p. 1392 —"advice and consultation, training, library and resource material, manuals, and [similar] support services." Memorandum from Gene Potack to Gregg Hartley 2 (Nov. 17, 1983), *quoted in* 581 F.Supp. at 1367. Other center functions, in Potack's opinion, responded to far less urgent needs. *Id.* Thus the Instruction required "[e]ach national support center recipient of Corporation funds [to] assure and certify," subject to circumscribed waivers on application to LSC's president, that "[a]t least ninety (90) percent of Fiscal Year 1984 LSC funds shall be allocated" to auxiliary service work of the kind just described. 48 Fed. Reg. at 54,305–06. No more than ten percent "shall be allocated for networking, direct representation ... and ... legislative or administrative testimony." *Id.* No 1984 LSC funds at all, the Instruction specified, "shall be utilized for national support Center branch offices." *Id.* at 54,305.

The district court noted that the written record supporting the Instruction was "extremely scant." 581 F.Supp. at 1367. Apart from the Instruction itself, Hartley and Potack produced just one document: a five-page memorandum from Potack to Hartley dated November 17, 1983. *Id.* LSC President Bogard approved the Instruction, just after the Thanksgiving weekend, on November 28. The next day it was sent to the *Federal Register* for publication. *Id.* at 1368.

## II. Discussion

The district court closely reviewed the record and made fact findings securely supported by it. We spy no abuse of discretion in that court's findings of historical fact or its application of our precedent establishing the propriety of a preliminary injunction

> when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977); *see also Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam) (requisite seriousness of injury to plaintiff is inversely proportional to probability of success on merits).[3]

The centers had raised three serious legal questions, the district court stated, and had shown a substantial likelihood of success on each of them. A ruling in favor of the centers on any one of the three, the district court observed, would justify a judgment preserving the status quo. We need not reach the first and third bases on which the district court found Instruction 83–9 vulnerable: the failure to expose the directive to public comment pursuant to section 1008(e) of the LSC Act, 42 U.S.C. § 2996g(e), *see* 581 F.Supp. at 1368–69; and the lack of rational support for the large alteration of center operations the Instruction mandated, *see id.* at 1370–72.[4] We

---

**3.** To comply with the Instruction, the district court found, the centers "would have to make significant, possibly irreversible, changes in their litigation procedures and the operations of their offices." 581 F.Supp. at 1373. No alternative sources of funding could be counted on to avoid drastic operational changes, nor could the centers rely on the possibility that their waiver applications would attract administrative grace. Money redress after the fact could not restore representation responsibilities relinquished or opportunities foregone. Furthermore, the preliminary injunction would "cause LSC little, if any, harm"; at most, it would require the Corporation to adhere for 12 months more to a

course of conduct LSC had pursued for many years. *Id.* The stop order would benefit legal services clients and lawyers for the poor who were aided by the activities of the support center branch offices, and it would avoid harm and losses clients and other attorneys might sustain from the midstream withdrawal of support center attorneys from pending cases. *Id.*

**4.** As one example of the arbitrary quality of the Instruction, the district court cited the ban on branch offices. The Instruction stated as "[t]he sole reason for the [branch office] restriction" the assumed fact "that support centers funded to serve all legal services programs with LSC fund-

pretermit these issues because we conclude that LSC erred most conspicuously by failing to stay within the confines Congress marked for it pending nomination by the President, and confirmation by the Senate, of an LSC board of directors.

In allocating fiscal year 1983 funds to LSC, Congress directed the Corporation to use the appropriation "so as to insure that total annual funding for each ... current grantee ... is maintained ... until action is taken by directors" confirmed by the Senate. Further Continuing Appropriations Act, 1983, Pub.L. No. 97–377, 96 Stat. 1830, 1876 (1982). The conference report accompanying this rider stated with unmistakable clarity that LSC was required not only to maintain each grantee's then-current level of funding, but also to furnish such funding under "the same terms and conditions [then] in effect for each said grantee." H.R. REP. No. 980, 97th Cong., 2d Sess. 171 (1982). From fiscal year 1983 through fiscal year 1985, in the face of continued impediments to Senate confirmation of an LSC board of directors, Congress has repeatedly reenacted the LSC funding rider; one such reenactment is the fiscal year 1984 provision at issue here.

Congress has at no time indicated that its purpose and meaning in containing action by an unconfirmed board, spelled out so plainly in the fiscal year 1983 conference report, has changed. Indeed, a Senate committee report introducing the latest, fiscal year 1985 restatement of the rider proclaims again the original understanding. The report reveals some congressional irritation with LSC and concern that "the Corporation has stood standard rules of statutory construction on [their] head." S. REP. No. 514, 98th Cong., 2d Sess. 57 (1984). It then declares:

> [T]he Committee does not believe that the Corporation has complied with the intent of the mandatory refunding provision, first enacted for fiscal year 1983 as

part of Public Law 97–377 and continued in fiscal year 1984. The Committee notes that the conference report on Public Law 97–377 clearly indicated that the provision applied to the terms and conditions of grants and contracts, as well as dollar levels, when it stated "[t]he conferees intend that such funding shall be provided under grants and contracts *containing the same terms and conditions now in effect* for each said grantee and contractor ..." ....

*Id.* at 58.

Confronted with these unambiguous announcements of the legislature's will, LSC urges us not to heed them because the 1984 appropriations act, on its face, prohibits only modification of funding *levels.* We reject LSC's argument. First, we note that the words "insure that total annual funding for each ... current grantee ... is maintained" are not self-defining. More fundamentally, however, LSC overestimates the persuasive force of the four-corners rule of statutory construction it proffers. As the Supreme Court has observed: "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Associations,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (footnote omitted); *see also Natural Resources Defense Council, Inc. v. EPA,* 725 F.2d 761, 768 (D.C.Cir.1984).

Nor are we impressed by LSC's plea that we read the fiscal year 1984 LSC rider in isolation, uncomplemented by the fiscal year 1983 conference report. It is indeed true that the conference report introducing the fiscal year 1984 measure does not set out again the elucidating reference to "terms and conditions." *See* 581 F.Supp.

---

ing of $500,000 or less cannot justify the additional overhead expenses of branch offices." 48 Fed.Reg. at 54,305. The prohibition, however, was addressed to *all* national support centers; in fiscal year 1984, only one center was slated to

receive less than $500,000 from LSC. Furthermore, Hartley and Potack possessed no information about branch offices' overhead expenses at the time the Instruction issued. *See* 581 F.Supp. at 1372 & n. 12.

at 1370. Had Congress reprinted the entire fiscal year 1983 report with the exception of the "terms and conditions" sentence, we would regard the omission as significant. But in fact the fiscal year 1984 report—which, like its predecessor, deals with a potage of appropriations measures—devotes barely more than a sentence to the LSC rider: "The conference agreement ... provides substantially the same language that has been in the law for the last year ...." H.R. REP. No. 478, 98th Cong., 1st Sess. 34 (1983). Congress, in short, continued the fiscal year 1983 law in force without alteration. It is not incumbent upon Congress to republish the legislative history from scratch in order to assure perpetuation of its will each time it reenacts a measure of limited duration.

If space ever existed for doubt whether the fiscal year 1983 conference report expressed what Congress constantly meant in periodically renewing the LSC appropriations rider, that space is now closed. As already recounted, *see supra* p. 1396, the fiscal year 1985 committee report repeats in full voice the original refrain. The fiscal year 1985 report, in the context of this case, does constitute postenactment legislative history, a species of evidence we generally handle with care. But it is postenactment history of a singularly reliable sort; under the circumstances this case presents, we find the 1985 reiteration worthy of considerable respect from the coordinate branches. The report concerns a rider indistinguishable from the one at issue here. It echoes and reinforces the expression of congressional meaning stated in the report accompanying the first appearance of that rider. And it issues from the same committee that drafted the initial rider only two years ago. *Cf. United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1187 (6th Cir.1982) (statements of subsequent Congress deserve deference when (1) expression of intent is unmistakable, (2) one statute is modeled after other, and (3) same congressional committee produced both legislative histories in ten-month span), *aff'd on other grounds,* —— U.S. ——, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). In the midst of this legislative holding pattern, LSC cannot responsibly maintain that fiscal year 1984 funds could be allocated without deference to the clear statements of the legislature's will that bracket the year so tightly.[5]

## CONCLUSION

The district court correctly held that Congress has prohibited LSC from altering the terms and conditions of grants while the LSC board remains unconfirmed. In all other pertinent respects as well, the district court's judgment is unexceptionable. Accordingly, the preliminary injunction against enforcement of Instruction 83–9 is

*Affirmed.*

MacKINNON, Senior Circuit Judge (concurring):

I concur in the foregoing opinion on the ground that the amendment brought about by Instruction 83–9 is impermissible at this time because of the recess appointment status of the board. The clearly expressed intent of Congress was to continue funding at pre-existing levels until the directors of the Legal Service Corporation had been confirmed in accordance with § 1004(a) of the Legal Services Corporation Act. In reaching this conclusion I do not wish to be interpreted as ruling at this time that Instruction 83–9 would in any way be improper, illegal or inadvisable if the directors of the corporation had been confirmed in accordance with the applicable Act.

---

5. By the November 30, 1984, argument date in this case, Congress' October-1-to-September-30 fiscal year had already expired. Moreover, reaffirmation of Congress' will should discourage repetition of Instruction 83–9 in fiscal year 1985. We therefore inquired at oral argument whether the case had become moot. We were advised that the fiscal year of which Instruction 83–9 speaks—the one on which LSC grantees operate—runs from January 1 to December 31. We were further informed that, should we lift the district court's injunction, Instruction 83–9 would apply to fiscal year 1984 funds the support centers had failed to spend before the date of our decision. The case thus appears resistant to a mootness dismissal.