**COMMITTEE FOR FAIRNESS, et al., Plaintiffs,**

v.

**Jack F. KEMP, Secretary of Housing and Urban Development, Defendant.**

**Civ. A. No. 87–0324 (HHG).**

United States District Court, District of Columbia.

May 7, 1992.

Florence Roisman; Nancy Tyler Bernstine, and Patricia Mullahy Fugere, Reno, Cavanaugh & Hornig, Washington, D.C., for plaintiffs.

Stuart A. Licht, Arthur R. Goldberg, Renee M. Wohlenhaus, Attys. Civil Div., U.S. Dept. of Justice; and Michael T. Robinson, Office of Litigation, U.S. Dept. of Housing and Urban Development, Washington, D.C., for defendant (Howard M. Schmeltzer, Asst. Gen. Counsel, U.S. Dept. of Housing and Urban Development, of counsel).

## OPINION

HAROLD H. GREENE, District Judge.

A number of public housing authorities from around the nation brought suit against the Secretary of Housing and Urban Development (HUD) for his implementation of a new method for calculating their operating subsidies and for doing so retroactively, in violation of the Administrative Procedure Act. Plaintiffs seek a declaratory ruling that these changes are invalid, and an injunction to prohibit HUD from recapturing some $68 million from the public housing authorities.[1] Pending before the Court are cross-motions for summary judgment.[2] Numerous briefs, affidavits, and exhibits have been submitted, and the Court has heard oral argument.

### I

### *General Background*

The factual backdrop of this suit is as follows. Plaintiffs, a collection of local public housing authorities (PHAs) in various states,[3] operate federally-assisted low-rent public housing pursuant to the Housing Act of 1937, 50 Stat. 888 as amended,

---

1. To the extent that the recapture has been completed, plaintiffs request a return to them of the housing subsidies authorized by the statute.

2. Specifically there are pending plaintiffs' motion for partial summary judgment, HUD's motion to dismiss or in the alternative for summary judgment, plaintiffs' cross-motion for summary judgment, and HUD's supplemental

motion for summary judgment against the Housing Authority of the County of King, State of Washington.

3. Plaintiffs have filed a stipulation of dismissal without prejudice with respect to six of the public housing authorities named in the complaint.

42 U.S.C. § 1401 *et seq.* Defendant HUD, in accordance with a 1974 amendment to the Act, provides the PHAs with annual operating subsidies to make up the difference between the amount of rent these entities may charge their tenants [4] and the PHA operating costs. Housing and Community Development Act of 1974, 88 Stat. 633, 752, 42 U.S.C. § 1437g(a)(1).

The 1974 amendment directed the Secretary of HUD to establish standards for determining the appropriate operating subsidy to be paid to each PHA. According to the statute, the implementing regulations were to

establish standards for costs of operation and reasonable projections of income, taking into account the character and location of the project and characteristic of the families served, or the costs of providing comparable services as determined in accordance with criteria or a formula representing the operations of a prototype well-managed project.

42 U.S.C. § 1437g(a). Pursuant to this statutory direction, and following notice and comment rulemaking procedures, HUD in 1976 established by regulation the "Performance Funding System" (PFS) as the method for such determinations. *See* 24 C.F.R. Part 990.

The PFS in effect for the fiscal years between 1976 and April 1, 1986 [5] provided that, in general, the operating subsidy to be awarded was the difference between a PHA's allowable expense level and its projected income as approved by HUD.

*See* 24 C.F.R. § 990.101. Under this system, projected income consisted of three components: dwelling rental income, investment income, and "other" income.[6] Under the PFS regulation, the local PHA was to calculate dwelling rental income projections based on a precise formula— that is, the rent roll for a particular month divided by the number of dwelling units then occupied. *See* 24 C.F.R. § 990.109(b). In contrast, projections of both investment income and "other" income were to be "based on the judgment of the PHA which will reflect past experience and a future projection for the Requested Budget Year...." 24 C.F.R. § 990.109(e).

Once the local PHA estimated its projected income for the following fiscal year, the projection was submitted to a HUD field office for approval. In reviewing the projections, the HUD field office could use a limited operating budget review procedure or it could request additional information as part of the review.[7] Following approval, the operating subsidies were distributed to the PHAs in advance of the period for which the funds were needed, on a monthly, quarterly, or yearly basis. 24 C.F.R. § 990.113(a).

Pursuant to regulation, HUD retained the power to initiate adjustments in the subsidies. However, the responsible official has stated that HUD considered the operating subsidies under the PFS to be "firm commitments ... not generally subject to revision." [8] The funding was ac-

---

**4.** With some exceptions, Congress has established that the maximum rent PHAs may charge their tenants is thirty percent of adjusted tenant income. 42 U.S.C. § 1437a(a).

**5.** As discussed below, many of the changes challenged by this lawsuit were adopted and made effective by way of notice and comment rulemaking for fiscal years beginning on or after April 1, 1986. *See* 50 Fed.Reg. 47368 (Nov. 18, 1985) (publishing a final regulation regarding a version of the target investment income program challenged here); 50 Fed.Reg. 52280 (Dec. 23, 1985). In 1988, Congress amended the statutory provisions of the Performance Funding System to negate some of the changes adopted by the agency. *See* 42 U.S.C. § 1437g (1988 amendments); 1987 U.S.Code Cong. & Admin.News 3317, 3334. Unless otherwise indi-

cated, the statutory and regulatory citations to the Performance Funding System herein refer to the version in effect prior to these amendments.

**6.** This third category includes items such as tenant payments for repairs and excess utility charges.

**7.** Under the PFS, HUD reserved the right to withdraw the limited review privilege. *See* 24 C.F.R. §§ 900.112(b), 990.112(c).

**8.** *See* October 26, 1983 Memorandum from Assistant Secretary Warren T. Lindquist to Steven Switzer, Assistant Inspector General for Audit. HUD now argues that the Assistant Secretary's Memorandum was not HUD policy. Reply Memorandum at 43.

cordingly approved and distributed on a forward-looking basis. What this meant is that if a PHA earned more income than it had projected, it could use the additional funds for eligible expenses not covered by the allowable expense level, or it could deposit the excess money in a reserve account. This system also meant, however, that if the PHA earned less than the projected income figure, it had to absorb the loss.[9]

## II

### Changes with Regard to Investment Income

Although the Performance Funding System had been in effect since 1976, beginning in the early 1980s the system of calculating the investment income portion of the PHA subsidy summarized above was considered by some HUD officials to be unsatisfactory.[10] HUD therefore implemented two changes in the method for calculating and assessing the investment income portion of the PHA's operating subsidies.

First. According to the section of the original regulation that dealt with investment income, a PHA was able to use its own judgment and experience to estimate both the amount of funds it would have available for investment, and the interest rate it would be able to secure in the coming fiscal year. See 24 C.F.R. § 990.109(e).

In place of this standard, HUD established a new set of criteria in 1982 for evaluating investment income estimates, known as the Target Investment Income program (TII). According to HUD, the program was intended to "provide an incentive procedure for improved cash management." [11]

The TII program replaced the old judgment-and-experience-based standard with a precise mathematical formula. Under that formula, the central office of HUD dictated the amount of funds a PHA would be deemed to have available for investment, as well as the interest rate it would be deemed capable of securing in the upcoming fiscal year.[12]

Although this new standard ultimately became the subject of notice and comment rulemaking (see infra), it was implemented as early as August of 1982 for application to PHA fiscal years beginning on January 1, 1982, on the basis of a mere change in HUD's Handbook for local income housing financial management issued in November of 1981.[13]

The program quickly generated both criticism and some confusion.[14] In response to various protests and comments, Assistant Secretary Winn issued a memorandum on December 10, 1982, which sought to clarify the program and in which he promised that revisions in the PFS regulation would soon

9. Plaintiffs contend, and HUD does not dispute, that the allowable expense level was consistently less than actual expenses, and that the PHAs were therefore constantly faced with a shortage of funds. See, e.g., Transcript of June 13, 1990 Hearing at 4.

10. Although some high officials at HUD stated that the existing system was properly designed to encourage PHAs to enhance their incomes through investment strategies, there were others who did not want a PHA to be able to obtain a "windfall" by underestimating the investment income portion of a subsidy proposal and thereafter engaging in superior investment strategies. There were also those who believed that the existing PFS system did not sufficiently penalize those PHAs which had bad track records in handling investments.

11. Sherman Declaration at ¶ 7.

12. This latter figure was based on a projected adjusted average of the Treasury Bill rate.

13. See November 18, 1981 "Change 10" to Chapter 4 of the Handbook.

14. For example, on January 11, 1982, Nile Paull of the Portland, Oregon Area HUD Office wrote to Assistant Secretary Winn, voicing various objections, and stating that "[t]he change is not consistent with [§ 109(e) of] the Performance Funding System Regulations." See July 11, 1982 Memorandum. Others asked for clarification of the program. See January 13, 1982 Memorandum of Fred H. Porterfield, Manager of the Louisville Area Office; March 16, 1982 Note from Kenneth Moul, Director, Fiscal Management Division, Office of Public Housing, to Arnold Diamond. Meanwhile, James Baugh, Acting Deputy Assistant Secretary, wrote to Arnold Diamond, Director, Office of Financial Management, referring to the "need to publish regulations ..." for the target investment income program. See November 5, 1982 Memorandum.

be promulgated. The following month the year-end reconciliations were to go into effect, but HUD had still failed to promulgate new regulations by that time, and complaints continued to be made.

Second. HUD developed a related program, called the Retroactive Recapture Program, which applied the new investment income formula established by the TII plan retroactively to expenditures in past budget years notwithstanding that such expenditures had long been approved and closed under the former, prospective-oriented subsidy evaluation system.

The new program was developed through a series of internal memoranda, beginning with a memorandum from Assistant Secretary Abrams on December 10, 1982, entitled "Guideline for the Closing of Findings relating to Investment Income Earned in Excess of Estimates," in which it was acknowledged that the "applicable procedures did not call for a year-end resettlement of subsidy payments." [15] The Abrams memorandum proposed to proceed with recaptures of the "overpayments," and it noted that, due to the lack of applicable procedures, the recaptures would be limited to the two most recent fiscal years.

There was significant confusion and dissension about this program as well, and for that reason it was initially not implemented. However, on April 11, 1984, Assistant Secretary Lindquist directed by way of an internal memorandum that the new criteria of the TII income program were to be applied to all past fiscal years for PHAs with 500 or more units.[16]

Like the TII system, the Retroactive Recapture Program was the subject of notice and comment rulemaking in 1984 and 1985, and it was made effective through a rule for PHA fiscal years beginning April 1, 1986.

Plaintiffs do not challenge the rules adopted through this procedure. However, they do maintain that the changes and the financial consequences flowing therefrom in the fiscal years between 1982 and April 1, 1986, are invalid as they were implemented without the benefit of rulemaking procedures or publication in the Federal Register. Plaintiffs also claim that the changes are the product of unlawful agency action which was arbitrary and capricious, an abuse of discretion, and inconsistent with the Housing Act and the regulations issued thereunder.

Plaintiffs estimate that the retroactive application of the two programs to the five budget years between 1982 and April 1986 has resulted in a deduction of approximately $68 million from the subsidies the PHAs would have received under the old Performance Funding System. As of the date of the hearing herein, plaintiffs estimated that all but $3 million of this amount had already been recaptured by HUD.

## III

### Changes With Regard to Rental Income and "Other" Income

When HUD decided to apply the target investment standards to past budget years, the agency also decided to reevaluate the estimates of rental and "other" income, and to recapture what it considered to be overpayments. New criteria were established for this recapture program as well. Like PHA estimates of investment income, estimates of "other" income under the Performance Funding System were to be based on the PHA's judgment and experience. The difference between the standards is that under the original Memorandum, any excess income from "other" income was to be automatically retained by the PHA, while under the criterion of the April 11, 1984 memorandum, the PHA was required to demonstrate that the excess charges were the result of unforeseen circumstances.[17]

---

15. *See* December 10, 1982 Memorandum from Philip Abrams, Assistant Secretary for Housing, to All Regional Administrators, Directors, and Field Office Managers and Supervisors.

16. That directive was modified by an August 31, 1984 memorandum from Mr. Lindquist, and then again by a September 26, 1984 memorandum.

17. The April 11, 1984 Recapture Memorandum issued by Assistant Secretary Lindquist directed that:

HUD proceeded with notice and comment rulemaking on the changes with regard to rental and "other" income, and in the final rule on the modification of the Performance Funding System published on November 18, 1985, the year-end recalculation of rental income and "other" income was eliminated. Thus, the Court is faced with the rather extraordinary situation with respect to rental and "other" income that HUD decided, following notice and comment, not to require a year-end recalculation for the period following final rulemaking, but that it still enforced such recalculation for the period prior thereto.[18]

## IV

### Notice and Comment

HUD is subject to the rulemaking requirements of the Administrative Procedure Act (APA). 24 C.F.R. Part 10; *Rodway v. U.S. Department of Agriculture*, 514 F.2d 809, 814 (D.C.Cir.1975); *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1084 (D.C.Cir.1978). Accordingly, when HUD intends to promulgate a substantive or legislative rule (as distinguished from an interpretative rule), it must first afford interested persons general notice of the proposed action and an opportunity to comment. Section 4 of the APA, 5 U.S.C. § 553; *Chrysler Corporation v. Brown*, 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979).

▬ It is not infrequently difficult to draw a precise distinction between rules which are merely interpretative of statutes and those which are legislative or substantive in character.[19] Legislative rules have generally been described as "those which create law, usually implementary to an existing law" while interpretative rules have been described as "statements as to what the administrative officer thinks the statute or regulation means." *Gibson Wine Company v. Snyder*, 194 F.2d 329, 331 (D.C.Cir.1952); *Cabais v. Egger*, 690 F.2d 234, 238 (D.C.Cir.1982). Substantive or legislative rules have also been described as those "affecting individual rights and obligations," for this is "an important touchstone for distinguishing those rules that may be binding 'or have the force of law.'" *Chrysler Corp. v. Brown, supra*, 441 U.S. at 302, 99 S.Ct. at 1718, *citing Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). *See also, Batterton v. Marshall*, 648 F.2d 694, 702 (D.C.Cir.1980); *Cabais v. Egger, supra; Air Transport Ass'n of America v. Dept. of Transp.*, 900 F.2d 369, 376 (D.C.Cir.1990); *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir. 1987). In any event, in light of the important policy goals of "maximum participation and full information," any exceptions to the APA's notice and comment requirements must be narrowly construed. *American Hospital Ass'n, supra*, 834 F.2d at 1044.

Despite the difficulty of determining where on the continuum of rules a particular regulation may fall, the Court is persuaded that, inasmuch as both the TII program and the Retroactive Recapture Program involved major changes in the method for evaluating subsidies, they were legislative or substantive rules.

The institution of the TII program effected two major changes: first, it replaced a subjective experience-based system of evaluating prospective investment income with a precise mathematical formula; and second, it replaced a forward-looking system with one involving year-end recalculations

[f]or other income, any amount realized that exceeds the PFS estimate by more than 110 percent shall be recovered ..., except where the PHA can demonstrate that the excess other income resulted from circumstances which could not be foreseen at the time the PHA's operating budget was submitted to HUD.

18. In addition to their attack on the TII and the Retroactive Recapture Program, plaintiffs also challenge a change in HUD's Litigation Handbook which created a new policy precluding PHAs from using federal subsidy funds for litigation against HUD. For the reasons stated in Section VI, *infra*, this claim will be dismissed as moot.

19. The distinction has been said to be "enshrouded in considerable smog." *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984), *citing American Bus Association v. ICC*, 627 F.2d 525, 529 (D.C.Cir.1980).

as a matter of course, in effect implementing a "contingent subsidy" system in place of a fixed or at least reliable one. The institution of the Retroactive Recapture Program involved these same two changes, in addition to a third practice implicit in the very name of the program—retroactivity.

These programs imposed new and mandatory obligations [20] on the PHAs, in place of the discretion that had previously been accorded to them. Moreover, as conceded by various HUD officials (see, e.g., note 14, supra), the changes contradicted the existing regulation, thus rendering new regulations necessary. In the Court's view, these officials understood the situation correctly.

HUD claims in response that the changes were mere elaborations or interpretations of a standard of reasonableness implicit in the statute and the regulation, and that on that basis they are exempt from the requirements of notice and comment.[21] The investment income portion of the PFS, says HUD, is imbued with an implicit standard of reasonableness, and the new TII standard—which established the interest rate on ninety day Treasury bills as the "reasonable" rate—is a mere elaboration of this standard.[22] In brief, according to HUD, all the tools for the present regime had already been given to the agency in the PFS.

There are several reasons why it is erroneous to assume that these tools existed and that the changes at issue here are not substantive.

First, it is clear that the existing regulations did not contemplate an automatic year-end recalculation for investment income. The statutory directive, the PFS regulation issued pursuant to that statute, and the practice at HUD since the inception of the PFS system, all indicate that PHAs

were expected to show that their projections were reasonable when made, not that with the benefit of hindsight they turned out to be correct.[23] According to Assistant Secretary Lindquist, "operating subsidies obligated in the approval of PHA budgets were viewed as firm commitments on a forward funding basis that would not generally be subject to revision."[24]

In fact, prior to 1982, there was only one mandatory year-end adjustment in the PFS, and that was for utilities. The fact that HUD had the power to make readjustments pursuant to 24 C.F.R. § 990.110(e) does not, as HUD now suggests, change the pattern of an evaluation from information available with respect to income at the beginning of the year to one available at the end of the year. That kind of a change was so fundamental in real, practical consequences that it could not legitimately be regarded as anything but substantive.

As Assistant Secretary Lindquist has said, section 990.110(e) was never intended to require

routine adjustment of any PFS components, including income estimates used in subsidy calculations when such estimates are less than actual income earned. In fact, a policy determination was specifically made in promulgating the PFS regulations that adjustment of income projection would not be required.

Id. The comments of other HUD officials affirm this position.

 Second, as indicated, the regulations used to state that the PHAs were to base their estimates of investment income on their own judgment and experience. This was subsequently replaced by a precise and mathematical formula which the PHAs were required to use and which con-

---

**20.** State of Alaska v. Department of Transportation, 868 F.2d 441, 446 (D.C.Cir.1989).

**21.** According to HUD, in directing the Secretary to fix standards for "reasonable projections of income," Congress established a standard of reasonableness with regard to the PHA projections of investment income. See 42 U.S.C. § 1437g(a).

**22.** HUD turns to section 990.110(e) of the PFS for the authority to recapture "overpayments"

that do not meet HUD's new interpretation of the standard of reasonableness.

**23.** See Transcript of June 13, 1990 Hearing at 33–34.

**24.** Memorandum from Warren T. Lindquist, Assistant Secretary for Public and Indian Housing, to Steven Switzer, Assistant Inspector General for Audit, October 26, 1983.

tradicted the existing regulation. Agency actions which establish new methods for determining the obligations of the regulated parties and the distribution of funds are subject to notice and comment rulemaking. *See Batterton v. Marshall, supra,* 648 F.2d at 706; *Cabais v. Egger, supra; National Senior Citizens Law Center v. Legal Services Corporation,* 581 F.Supp. 1362, 1369 (D.D.C.1984), *affirmed on other grounds,* 751 F.2d 1391 (D.C.Cir.1985). As for retroactive applications of administrative rules, they are not favored, and a statutory grant of legislative rulemaking authority will generally not be understood to encompass the power to promulgate retroactive rules. *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Surely, then, a retroactive administrative rule could hardly be termed anything other than substantive.

The need for notice and comment is also sustained by the fact that HUD did go precisely by that route in the 1984–86 time frame with respect to this same subject matter. This sequence of events at a minimum places HUD in the awkward position of seeking to legitimate the retroactive application of rules it declined to adopt prospectively without the Administrative Procedure Act formalities.[25]

## V

### *Retroactive Recapture Program*

■ HUD further argues, in an attempt to salvage the Retroactive Recapture Program, that it and the TII program were separate entities, and that the former did not involve any change at all, but that this unchanged standard was merely applied pursuant to section 990.110(e). In support of this argument, HUD relies on a sentence in an August 31, 1984 memorandum from Assistant Secretary Lindquist, which, after laying out the five-part formula to be used for recaptures, states that:

> [t]he decisive element in determining whether subsidy adjustment is appropriate is whether the PHA used its best available information and judgment in making the estimates.[26]

According to HUD, this sentence is so close to the experience-based standard that the various criteria in the memorandum act merely as "triggering" criteria, rather than as "ultimate" criteria.

These arguments are without merit. HUD cannot eliminate from the record the precise criteria in the August 31, 1984 Lindquist Memorandum, and any reasonable person reading the memorandum would assume these criteria were the ones to be applied. An attempt to cause them in effect to disappear by calling them triggering criteria is but bureaucratic legerdemain. Moreover, as plaintiffs have pointed out, it is these five criteria that were intended to be applied, and were in fact applied, by the HUD field offices.[27]

HUD's argument misses a focal part of the case—the imposition of new standards. The Department certainly had the power to reevaluate past subsidy grants under the longstanding criteria established by the PFS,[28] but this is not the same as the implementation of an entirely new subsidy evaluation system.

In short, for the reasons stated, it appears from the face of the new programs that they did not simply constitute interpretations of an implied standard of reason-

**25.** In theory, the fact that HUD ultimately proceeded with notice and comment rulemaking may simply reflect a desire to put an end to the instant litigation—as HUD argues—and not to indicate that such action was legally required. Nevertheless, given the statements of other agency officials that such rules should be promulgated, the action supports the proposition that the changes were deserving all along of the rulemaking procedures ultimately pursued.

**26.** *See* August 31, 1984 Lindquist Memorandum, pp. 122–125.

**27.** HUD also contends that any field offices which applied the formula were doing so contrary to the intent of the agency.

**28.** This would be, for example, because a particular PHA had used a fraudulent estimate for investment income, or had proposed an estimate which was later revealed to be unreasonable at the time it was made, given the PHA's judgment and past experience.

ableness, but were rules of a legislative character which charted an entirely new direction for the review of PHA subsidies.[29] This conclusion is also buttressed by the fact that numerous high level HUD officials believed that the new investment standards were inconsistent with the existing regulation, and that a new regulation would need to be promulgated.[30] These officials made repeated written requests that the agency proceed with a new regulation. Despite promises to promulgate a new regulation that would incorporate the changes, HUD did not proceed with notice and comment rulemaking until July 30, 1984, when it published a proposed rule, made final on November 18, 1985 for PHA fiscal years beginning April 1, 1986. In fact, as noted above, as a result of the notice and comment process, the proposal to implement year-end recalculation of rental income and "other" income was eliminated.

Notice and comment rulemaking is designed to facilitate the informed and reasoned decisionmaking of governmental agencies, and to "assure the legitimacy of administrative norms." *Air Transport Ass'n of America v. Department of Transportation,* 900 F.2d 369, 375 (D.C.Cir.1990). As the court said in *Batterton, supra,* 648 F.2d at 703, "[t]he essential purpose of according ... notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *See also, American Hospital Ass'n v. Bowen, supra,* 834 F.2d at 1044. For these significant reasons, courts construe narrowly the exception to notice and comment rulemaking. *See Air Transport Ass'n, supra,* 900 F.2d at 375; *American Hospital Ass'n, supra,* 834 F.2d at 1044.

For the reasons stated, the Court finds that HUD's actions violated the requirements of notice and comment rulemaking, and on this basis [31] it will grant plaintiffs' motion for partial summary judgment.[32]

**29.** It may be noted that Judge Oberdorfer of this Court expressed the view in related litigation that the Target Investment Income program would likely "prove to be null and void and can only be reinstated prospectively by for example, the regulations now in process after notice and comment," and that "the subsidy recapture program is the drastic kind of agency action which can probably become effective only after notice-and-comment." *See Council of Large Public Housing Authorities v. Pierce,* Civil Action No. 84–3114, Memorandum and Order at 2 (D.D.C. February 25, 1985).

Congress has likewise indicated that the changes at issue involved a radical change in the Performance Funding System. A report of the House Committee on Banking, Finance, and Urban Affairs described the changes HUD had implemented and the need for the amendments as follows:

... In the recent past HUD has attempted, without agreement from Congress, to modify regulations and policies governing this program. These efforts have included efforts to retroactively impose new standards on the investment and recapture of excess income, reduce or eliminate operating subsidy payments for vacant units and require an end-of-year adjustment to reconcile the differences between projected and actual dwelling rental and other income. Not only would these and other proposed changes have substantially distorted the system Congress and the public housing authorities have generally endorsed, but the so-called reforms were punitive in

nature and were not designed to reward improved management and budgetary practices. H.R.Rep. No. 122, 100th Cong. (1987); 1987 U.S.Code Cong. & Admin.News 3317, 3334.

**30.** When HUD was first considering the adoption of the Target Investment Incentive program, Thomas Sherman, Director of HUD's Office of Public Housing, wrote that to implement the incentive system, "it would be necessary to revise the Performance Funding System (PFS) regulations." December 23, 1980 Memorandum from Thomas Sherman to Arnold Diamond. Director Sherman worked at HUD since 1958 and was HUD's senior consulting advisor on public housing. Others at HUD shared Sherman's views.

**31.** Plaintiffs also claim that HUD's actions were arbitrary and capricious, and cross-motions for summary judgment have been filed on this issue. However, since the Court has concluded that the government's actions violated the notice and comment requirements, the arbitrary and capricious issue need not be reached. For the same reason, the Court will not reach plaintiffs' argument that HUD's actions amounted to a general policy statement and were therefore adopted in violation of the publication requirements of the Freedom of Information Act.

**32.** HUD argues that the claims of King County Public Housing Authority were raised and decided in a case filed in the Western District of

## VI

### Litigation Funds

■ In addition to their attack on the implementation of changes with respect to investment income, plaintiffs have also challenged a HUD policy of prohibiting PHAs from using federal subsidy funds for litigation against the agency. According to plaintiffs, the change is invalid because (1) it was instituted by a change in the HUD litigation handbook, rather than through notice and comment rulemaking, (2) it has no statutory basis and is therefore the fruit of an arbitrary and capricious agency action, and (3) it is contrary to public policy in that it will burden and reduce judicial review of administrative actions.[33]

HUD has responded to plaintiffs' claim by promising in writing not to enforce the provision against them until the provision is promulgated as a regulation and published as a proposed rule in the Federal Register.[34] Plaintiffs nevertheless claim that their challenge of this change still deserves resolution because HUD's written commitment is unenforceable and is subject to withdrawal.[35] The Court disagrees. Given that counsel's promise was made on behalf of HUD, and since it has been stated that HUD is bound by the representation, there is no likelihood that the commitment will be revoked and the policy later applied to plaintiffs.[36]

Accordingly, the Court will dismiss this claim as moot.

Washington, *The Housing Authority of the City of Tacoma, et al. v. Department of Housing and Urban Development*, Civ. No. C85–1576F (W.D.Wash.), and are therefore barred by the doctrine of res judicata. In that case, the plaintiff was one of several public housing authorities requesting a stay of HUD's recapture program pending the disposition of a "test case" filed in this District Court, *Council of Large Public Housing Authorities, et al. v. Pierce*, Civil Action No. 84–3114, in September 1986. The court dismissed the plaintiff's motion for a stay for lack of subject matter jurisdiction on the theory that the claim was one for monetary relief against the federal government, and that therefore only the Court of Claims had jurisdiction to render a judgment. The decision in that case is res judicata here. *Angel v. Bullington*, 330 U.S. 183, 190, 67 S.Ct. 657, 661, 91 L.Ed. 832 (1947).

## VII

### Relief

■ Inasmuch as the necessary rulemaking procedures were not used for the fiscal years prior to April 1, 1986, the plaintiffs are entitled to relief. The question is what relief is appropriate.

Plaintiffs have requested a declaratory ruling to the effect that the new programs are invalid for those years, and an injunction prohibiting HUD from deducting amounts from future PHA subsidies pursuant to these programs. According to plaintiffs, the amount that HUD had yet to recapture as of the time of the hearing was approximately $3 million.

As for the years for which HUD has required the PHAs to use the new system, plaintiffs have requested that the case be remanded to HUD for recalculation of what subsidy would have been granted under the old Performance Funding System. It is claimed that this would not be difficult to do with regard to the implementation of the recapture program, because the figures have already been generated. The calculation of the financial impact of the TII program may prove more difficult, because it will require the PHAs to reconstruct what estimates they would have made under the old system.

For this reason, as well as others, HUD opposes the remedy sought by the plain-

**33.** *See* Plaintiffs' Consolidated Memorandum (August 24, 1987) at 35–38, 59–61.

**34.** HUD's Associate General Counsel wrote to plaintiffs' counsel that "HUD will not take action to enforce [the litigation expense] section of the Handbook against any of the plaintiff PHAs in this or future litigation...."

**35.** *See* Plaintiffs' Notice of New Rulings and a Proposed Rule filed December 29, 1988; Plaintiffs' Consolidated Memorandum in Opposition to Defendant's Motion to Dismiss, filed August 24, 1987, at 35–38; Plaintiffs' Reply, filed December 4, 1987, at 12–13.

**36.** *See United States v. W.T. Grant Company*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

tiffs. According to HUD, it will be difficult or impossible for the PHAs to demonstrate what subsidy decisions they would have made, had it not been for the implementation of the TII program.

The Court has concluded that this should not be an insurmountable problem. The PHAs may submit proposals to HUD of what they would have estimated based on their past experience,[37] and HUD could then evaluate on the basis of these, as well as any other documents, what the PHAs would have included in the prior subsidy evaluation process. HUD could also compare these estimates to those fiscal submissions shortly preceding the implementation of the TII program.

HUD also argues that the remedy plaintiffs have sought is inappropriate because it will apply to what is now past conduct, and it will therefore involve the transfer of funds to the PHAs rather than the barring of future deductions. This argument must fail.

It should be noted that HUD had not recaptured all of these sums as of February 7, 1987 when plaintiffs filed suit after settlement negotiations failed. The failure of HUD to recapture the amount outstanding since that date is due to delays generated in part by it and in part due to the long pendency of this case. It would be inequitable to penalize plaintiffs for delays not of their creation.

More important, for those sums recaptured prior to the time when plaintiffs filed suit, the Court finds that the injunctive relief and rescission of the recapture plaintiffs seek are necessary if plaintiffs' rights are to be vindicated.[38] And there is no sound reason why the return of the funds should not be granted.[39]

The Court will remand the case to HUD for a determination of the financial consequences to the PHAs of the application of the Target Investment Income program and the Retroactive Recapture Program. The PHAs may submit their computations on this issue to HUD before July 31, 1992, and HUD will then have sixty days following the submission to submit its final computation to the Court.

For the foregoing reasons, the Court is granting plaintiffs' motion for partial summary judgment with respect to the notice and comment claim on the calculation of investment, rental and other income; and an injunction prohibiting HUD from recapturing any additional funds with respect to the years prior to the adoption of a valid rule pursuant to the investment and recapture programs; and it remands the case to the Secretary of Housing and Urban Development for calculation of the subsidy that should have been granted under the Performance Funding System that was used before HUD implemented the program challenged in this lawsuit.

An Order to that effect, and otherwise denying the parties' cross-motions for summary judgment, and granting HUD's motion to dismiss the County of King PHA on res judicata grounds is being issued contemporaneously herewith.

## ORDER

Upon consideration of the motions for summary judgment and partial summary judgment, the memoranda in support thereof, the opposition and replies thereto, and the entire record herein, and consistent with the Opinion being issued contemporaneously, it is this 7th day of May, 1992

ORDERED that plaintiffs' motion for partial summary judgment in reliance on

---

37. In a settlement proposal of November 21, 1986, plaintiffs listed each PHA and the amount by which it was affected by the two programs. *See* Plaintiffs' Exhibit I, KK, Attachment A. Although this document may require revision, it demonstrates that the calculations are not likely to be as problematic as HUD contends.

38. *See Maryland Dept. of Human Resources v. H.H.S.,* 763 F.2d 1441 (D.C.Cir.1985).

39. At one point HUD argued that the Court lacks jurisdiction over the subject matter of this action and that plaintiffs could only pursue their claim under the Tucker Act in the Claims Court. However, HUD later withdrew this argument in light of the Supreme Court's decision in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). *See* Defendant's Notice of Withdrawal of Argument in Support of Motion to Dismiss, filed September 2, 1988.

the Administrative Procedure Act be and it is hereby granted; and it is further

ORDERED that plaintiffs' claim for partial summary judgment regarding the use of federal subsidy funds for litigation against HUD be and it is hereby denied as moot; and it is further

ORDERED that in other respects plaintiffs' motion for summary judgment be and it is hereby denied; and it is further

ORDERED that defendant's motion to dismiss claims of the Public Housing Authority of the County of King, State of Washington, on res judicata grounds be and it is hereby granted; and it is further

ORDERED that defendant's motion to dismiss or in the alternative for summary judgment be and it is hereby denied; and it is further

ORDERED that defendant be and he is hereby enjoined from recapturing any additional funds with respect to the years prior to the adoption of a valid rule pursuant to the investment and recapture programs; and it is further

ORDERED that the affected Public Housing Authorities shall submit to defendant by July 31, 1992, their computations of the financial consequences to them of the application of the Target Investment Income program and the Retroactive Recapture Program prior to its valid adoption, and defendant shall submit his final computation of such financial consequences to the Court within sixty days following those submissions.